March 23, 1994 UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 92-1447

UNITED STATES OF AMERICA,
Appellee,

v.

PETER BRANDON,
Defendant, Appellant.

No. 92-1465

UNITED STATES OF AMERICA,
Appellee,

v.

CHARLES D. GAUVIN,
Defendant, Appellant.

No. 92-1466

UNITED STATES OF AMERICA,
Appellee,

v.

MARVIN GRANOFF,
Defendant, Appellant.

No. 92-1467

UNITED STATES OF AMERICA,
Appellee,

v.

RONALD R. HAGOPIAN,
Defendant, Appellant.

No. 92-1468

UNITED STATES OF AMERICA,
Appellee,

v.

MOMI A. KUMALAE,
Defendant, Appellant.

No. 92-1469

UNITED STATES OF AMERICA,
Appellee,

v.

OWEN B. LANDMAN,
Defendant, Appellant.

No. 92-1470

UNITED STATES OF AMERICA,
Appellee,

v.

NORMAN D. REISCH,
Defendant, Appellant.

No. 92-1471

UNITED STATES OF AMERICA,
Appellee,

v.

JOHN WARD,
Defendant, Appellant.

Before

Torruella, Circuit Judge,

Campbell, Senior Circuit Judge,

and Boudin, Circuit Judge.

ORDER OF COURT

Entered March , 1994

The opinion of this Court issued on January 31, 1994, is
amended as follows:

Page 50, last paragraph, line 3, delete the sentence that
starts with "For the transactions . . ." and insert the
following: "Ward helped to solicit the buyers involved in the
transactions for these counts by telling them that no down
payments were required."

Page 51, line 2, delete the sentence that starts with "He
nevertheless . . ." and insert the following: "He directed one
of these buyers to provide a down payment check that would be
funded by someone else and then cashed so that the funds could be
returned."

Page 51, line 10, delete "Brandon's insurance company" and
insert "the buyer's insurance company."

By the Court:

Francis P. Scigliano

Clerk.

UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 92-1447

UNITED STATES OF AMERICA,

Appellee,

v.

PETER BRANDON,

Defendant, Appellant.

No. 92-1465

UNITED STATES OF AMERICA,

Appellee,

v.

CHARLES D. GAUVIN,

Defendant, Appellant.

No. 92-1466

UNITED STATES OF AMERICA,

Appellee,

v.

MARVIN GRANOFF,

Defendant, Appellant.

No. 92-1467

UNITED STATES OF AMERICA,

Appellee,

v.

RONALD R. HAGOPIAN,

Defendant, Appellant.

No. 92-1468

UNITED STATES OF AMERICA,

Appellee,

v.

MOMI A. KUMALAE,

Defendant, Appellant.

No. 92-1469

UNITED STATES OF AMERICA,

Appellee,

v.

OWEN B. LANDMAN,

Defendant, Appellant.

-2-

No. 92-1470

UNITED STATES OF AMERICA,

Appellee,

v.

NORMAN D. REISCH,

Defendant, Appellant.

No. 92-1471

UNITED STATES OF AMERICA,

Appellee,

v.

JOHN WARD,

Defendant, Appellant.

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

[Hon. Ernest C. Torres, U.S. District Judge]

Before

Torruella, Circuit Judge,

Campbell, Senior Circuit Judge,

and Boudin, Circuit Judge.

-3-

Dana A. Curhan, by Appointment of the Court, for appellant

Peter Brandon; John A. MacFadyen with whom Richard A. Gonnella,

was on brief for appellant Charles D. Gauvin; Thomas J. May, with

whom Carol A. Fitzsimmons and Johnson, Mee & May, were on brief

for appellant Marvin Granoff; Barbara A. H. Smith for appellant

Ronald R. Hagopian; William C. Dimitri, by Appointment of the

Court, with whom Dimitri & Dimitri, was on brief for appellant

Momi A. Kumalae; Donald P. Rothschild, by Appointment of the

Court, with whom Tillinghast Collins & Graham, was on brief for

appellant Owen B. Landman; Barbara A. H. Smith for appellant

Norman D. Reisch; and Catherine C. Czar, by Appointment of the

Court, for appellant John Ward.
Craig N. Moore, Assistant United States Attorney, with whom

Edwin J. Gale, United States Attorney, and Margaret E. Curran,

Assistant United States Attorney, were on brief for appellee.

January 31, 1994

-4-

TORRUELLA, Circuit Judge. The eight defendants in this

case were convicted of conspiracy to commit bank fraud under 18

U.S.C. 371 and of a varying number of bank fraud counts under

18 U.S.C. 1344 and 2 following a jury trial in the district

court. They now challenge their convictions and sentences on a

wide variety of grounds. For the reasons set forth below, we

affirm all of the convictions except for the bank fraud

convictions on Counts 24 and 25 against defendant John Ward and

the bank fraud convictions on Counts 23 through 26 against

defendant Owen Landman, which we reverse.

I. BACKGROUND

This case involves an alleged scheme to obtain loan

financing from a federally insured bank by fraudulently

representing the existence of down payments required by the bank

from the investors on whose behalf the loans were made.

According to the record in this case, viewed in the light most

favorable to the government, United States v. Van Helden, 920

F.2d 99, 101 (1st Cir. 1990), the facts of this scheme are as

follows.

On January 1, 1985, defendant Peter Brandon and two

others formed a partnership called Dean Street Development ("Dean

Street")1 for the purpose of buying, developing, and selling

real estate. Specifically, Brandon planned to buy and renovate

1 Several partnerships and corporations related to Dean Street
were also involved in this case. Together they are collectively
referred to here as "Dean Street." Brandon controlled all of the
various entities.

-5-

motels along the Rhode Island seashore, convert them into

condominiums and then sell the individual rooms to investors as

condominium units. As part of this plan, the condominium buyers

would lease the units back to Dean Street and Dean Street would

then manage the properties as motels. Under the "lease-back"

agreement with the buyers, Dean Street would apply the income

from the operation of the motels to cover the monthly mortgage,

tax and insurance costs incurred by the unit buyers. Any

shortfalls in operating costs would be made up by Dean Street,

leaving the buyers with no monthly costs on their investment.

In addition, buyers would be allowed to use their units

for two weeks out of the year. Dean Street would also guaranty

them a certain level of profit at sale. Some buyers would

receive rebates for each unit they purchased. In short, the

buyers would be offered a sweet deal.

To make the deal even sweeter, Brandon planned to

arrange all the financing for the buyers. He hoped to obtain

100% financing, that is, loans for the complete purchase price of

each unit. With such financing, buyers could invest in the

project without putting any money down and consequently obtain

that elusive -- yet apparently not uncommon for the fast-paced

world of 1980s real estate -- deal of "something for nothing."

In early 1987, Brandon approached Homeowner's Funding

Corporation ("Homeowners"), a mortgage broker that acts as an

intermediary between banks and borrowers, to obtain these "end

loans" for the buyers. Homeowners' President told Brandon that

-6-

100% financing was unavailable for the project. Rather, the best

Brandon could hope to find was 80% financing with a 20% down

payment required from the buyers. Homeowners subsequently

searched for a lender and, after approaching several banks,

located Bay Loan and Investment Bank ("Bay Loan"), a financial

institution insured by the Federal Deposit Insurance Corporation.

Bay Loan agreed to lend buyers of Dean Street's condominium units

up to 80% of the required purchase price.

Homeowners, as well as East-West Financial Corporation

("East West"), the other mortgage broker involved in this case,2

acted as brokers and servicing agents for Bay Loan. Bay Loan was

the actual lender for the Dean Street project and it financed

every condominium sale involved in the scheme. By prior

agreement, Homeowners and East West provided the original

mortgages for the buyers and then sold them to Bay Loan.

Homeowners and East West would forward all the loan applications

to Bay Loan for approval prior to providing the mortgages for the

condominium units.3 The decision of whether to fund a

particular mortgage rested entirely with Bay Loan and Bay Loan

2 Toward the end of 1987, Brandon became dissatisfied with what
he considered the slow pace at which Homeowners was processing
the loans and, after a dispute with Homeowners, retained the
services of East West to continue the project. East West
continued where Homeowners left off with Bay Loan again agreeing
to act as the end loan financier.

3 The brokers would not provide the financing to the buyers
without first getting Bay Loan's agreement to purchase and fund
the loans. In fact, Homeowner's line of credit for issuing funds
to the buyers specifically prohibited the disbursement of money
without a commitment from the ultimate lender, in this case, Bay
Loan, to fund the loan.

-7-

set the terms and conditions of each mortgage.

As Bay Loan Vice President of consumer lending, Joseph

Gormley, explained to Brandon, the bank required each buyer of a

condominium unit to make at least a 20% down payment to the

seller, Dean Street, before Bay Loan could fund the loans.

Instead of instructing buyers to provide the required down

payments, however, Brandon concocted a scheme that permitted

buyers to avoid the down payments altogether. As a result, he

was able to pursue his original goal of obtaining 100% financing

for the condominium project. The scheme was formulated during

the spring and summer of 1987 when Brandon had several

discussions with, among other people, his attorney, George

Marderosian, and co-defendant Norman Reisch, another of

Marderosian's clients, concerning ways that the 20% down payment

requirement "might be satisfied by alternative methods or might

be avoided." During that period, Brandon also told another

person involved in the conspiracy, Claude Limoges, that the down

payments would be falsified.

Brandon planned and employed three basic methods of

falsifying the down payments. The first method was simply

providing money to the various buyers which the buyers would then

use to make the down payments to Dean Street. Usually the money

came from third-party investors to whom Brandon promised a

commission for each down payment they funded. Once the buyer

made the down payment to Dean Street, Dean Street would return

the money to the investor leaving a paper trail for a down

-8-

payment that was never actually made. The second method involved

obtaining down payment checks from the buyers and promising not

to cash them. Copies of these nonnegotiated checks would remain

in the loan file to give the appearance that real funds had

actually been transferred. The third method was to provide

second mortgages to the buyers to fund their down payments and

then to discharge those mortgages after the closings.4

The first method of avoiding down payments was employed

from the outset of the scheme. Co-defendants Charles Gauvin and

Marvin Granoff, two clients of Marderosian, agreed with Brandon

to purchase some units at the Charlestown Motor Inn. Gauvin and

Granoff also agreed to provide down payment funds to other buyers

for subsequent unit sales. Brandon promised them $1000 for each

unit sold with their down payment funds. In August of 1987,

Gauvin, Granoff and a third person each purchased four units.

Marderosian conducted the closing and co-defendant Owen Landman,

an attorney who shared office space with Marderosian, acted as

escrow agent. During the closing, Marderosian recorded the

amount of each down payment ($20,500) on the closing statements -

- also called the HUD settlement sheets -- as "amounts paid by or

in behalf of borrower."5

Gauvin provided the down payment funds for these twelve

4 Brandon also falsified the loan applications of otherwise
unqualified buyers.

5 Throughout the project, the HUD settlement sheets were signed
by Brandon and the buyers, including those defendants who
purchased units.

-9-

purchases but no actual payment was ever made; instead, the funds

were passed through Dean Street and returned to Gauvin. At the

closing, Gauvin delivered twelve separate checks for $20,500 each

to Marderosian, drawn on an account that only had a $6000 balance

at the time, and Landman deposited the checks in his escrow

account. Landman then wrote twelve corresponding checks to

Marderosian who in turn wrote checks to Dean Street for identical

amounts of $20,500 each. Two days later, Dean Street wrote

twelve checks back to Gauvin for the same amounts of $20,500 each

and Gauvin deposited the money in the original checking account

to cover his initial twelve checks written as down payments to

the seller.

In late August and September of 1987, Gauvin provided

down payments for the purchase of units at the Charlestown Motor

Inn and at the Bayside Motel by Reisch and others. As with the

first purchases, Dean Street returned the down payment money

within a matter of days and also paid Gauvin an additional $1000

per unit.

In the beginning of 1988, Bay Loan began requiring that

down payments be made with certified funds. Gauvin and Granoff

agreed to provide buyers with funds so that they could obtain

certified checks before the closings. In January and February of

1988, Granoff supplied $470,000 to Marderosian who deposited the

funds and began distributing the money to prospective buyers.

The original intention was that Dean Street would pay back the

money to Granoff a few days after each closing as it had done in

-10-

the previous transactions. Brandon, however, never returned the

money as planned.6

With no more money coming from Gauvin and Granoff,

Brandon discussed the possibility of funding buyer down payments

with Reisch. Reisch had earlier supplied down payment money for

a buyer and was reimbursed by Dean Street the next day. Reisch

agreed to provide the money, but only if he could wire the money

directly to the buyers on a transaction by transaction basis in

order to avoid having large amounts outstanding. Funds were

wired to buyers on several occasions and the buyers then wrote

down payment checks with the money. The checks were either

deposited in Landman's escrow account or endorsed directly back

over to Reisch. Those funds deposited in escrow were promptly

returned to Reisch.

The second method of falsifying down payments, using

nonnegotiated checks, was employed less frequently. In October

of 1987, co-defendants Ronald Hagopian and John Ward purchased

several units at the Bayside Motel using nonnegotiated checks for

their down payments. Brandon also enlisted Hagopian and Ward,

both real estate brokers, to solicit other buyers for the

project. Hagopian and Ward told several of the buyers they had

recruited to provide down payment checks which they promised

would never be cashed. These buyers proceeded to write checks to

Dean Street and those checks were never negotiated.

6 Brandon did eventually agree to a repayment schedule but,
ultimately, none of Granoff's money was ever repaid.

-11-

The third method of falsifying down payments was

through dischargeable mortgages. Joseph Gormley at Bay Loan

approved a plan for buyers to make only 5% down payments in

certified funds with the balance of a required 25% down payment

to be satisfied by a second mortgage provided by Dean Street.

Dean Street began providing these mortgages to the buyers, but

the mortgages were promptly discharged7 after the closings

because Dean Street never actually intended to obligate the

buyers. The discharges were accomplished by a "purchase price

adjustment" given to buyers after the sale to "compensate" them

for promised renovations that Dean Street was suddenly unable to

make. In reality, the renovations "were never going to happen"

in the first place.

At the closings, some of the buyers inquired about the

second mortgage documents because Brandon had promised a

discharge and the buyers wanted to know when that would take

place. The "purchase price adjustment" letters that discharged

the mortgages were excluded from the closing documentation so the

bank would not see them. During the closings, Landman gestured

to several buyers that they should not mention the matter to him.

Brandon's assistant at Dean Street, co-defendant Momi Kumalae,

did speak to buyers about the discharges and assured them that

they would be taken care of. Kumalae also signed many of the

7 Testimony was offered by defendants to the effect that the
discharges provided by Dean Street were not legally enforceable
and that the buyers are still obligated on the mortgages. We
find this possibility irrelevant as the intent was clearly to
discharge the mortgages.

-12-

discharge letters sent to the buyers.

Despite the sale of almost 200 units, by the fall of

1988, the loan proceeds from Bay Loan's financing of unit

purchases was falling well short of Dean Street's expenses and

its own debt service. Dean Street quickly fell behind schedule

in making the mortgage payments on all the Bay Loan condominium

unit loans, and it eventually stopped making any payments by

early 1989.

Between August 1987 and October 1988, Dean Street had

sold 196 units to 79 different buyers, all financed by Bay Loan

in 176 separate loans. The face value of the loans was $18.8

million and Bay Loan actually distributed $17.3 million to

Marderosian who passed on about $16.9 million to Dean Street (the

balance was retained as fees or was paid to Landman for escrow

services). As of the trial, approximately $16.3 million remained

outstanding on the loans.

Gormley at Bay Loan, who approved the loans, did not

know that down payment funds came from sources other than the

buyers, that some down payments were nonnegotiated checks, that

second mortgages were being discharged, or that buyers were being

paid to purchase units. Gormley testified that he would not have

approved the loans if he had been aware of any of these

circumstances.

On February 28, 1991, a federal grand jury sitting in

the District of Rhode Island handed down a 27-count indictment

charging the eight appellants and four others with defrauding Bay

-13-

Loan, a federally insured financial institution, of approximately

$18 million. Count 1 charged all twelve defendants with

conspiracy to commit bank fraud in violation of 18 U.S.C. 371.

Counts 2 through 27 charged various defendants with individual

acts of bank fraud, under 18 U.S.C. 1344, based on individual

loan transactions executed during the scheme to defraud.8 Four

of the defendants pleaded guilty and did not go to trial. Two of

the four, George Marderosian and Claude Limoges, testified for

the government.

After a trial in the United States District Court for

the District of Rhode Island, the jury found all the defendants

guilty of conspiracy and each defendant guilty on multiple counts

of bank fraud. Some defendants were acquitted on individual bank

fraud charges as discussed below. This appeal followed.

II. FAILURE OF THE INDICTMENT TO STATE AN OFFENSE

Defendants first argue that the indictment failed to

state an offense with respect to the conspiracy count because it

did not allege that the United States or one of its agencies was

the target of the conspiracy. Count I of the indictment charged

defendants with conspiring to commit an offense against the

8 One bank fraud count was later dismissed by the government so
that 26 total counts remained for trial. Brandon was the only
defendant charged in all of the counts.

Each bank fraud count charges one or more of the defendants
with facilitating in some way the fraudulent representation of
the required down payment for a specific loan for an individual
condominium unit. Although each unit purchase allegedly involved
the same fraudulent scheme, only 26 specific executions of the
scheme were originally charged.

-14-

United States in violation of 18 U.S.C. 371 by executing a

scheme to defraud Bay Loan under 18 U.S.C. 1344. Section 371

makes it a crime to "conspire either to commit any offense

against the United States, or to defraud the United States, or

any agency thereof" (emphasis added). The Supreme Court held in

Tanner v. United States, 483 U.S. 107, 128-132 (1987), that in

order to establish a conspiracy to "defraud the United States,"

under the second clause of 371, the government must prove that

the target of the fraud was the United States or one of its

agencies. Id. (finding a recipient of federal financial

assistance and supervision not to be an agency of the United

States for purposes of 371). The defendants contend that this

requirement should be extended to the first clause of 371 for

alleged conspiracies "to commit any offense against the United

States."

18 U.S.C. 371 creates two distinct criminal offenses:

conspiracies to commit offenses against the United States and

conspiracies to defraud the United States. See, e.g., United

States v. Haga, 821 F.2d 1036, 1039 (5th Cir. 1987). The "any

offense" clause of 371 ("to commit offenses against the United

States") is aimed at conspiracies to violate the laws of the

United States. It does not refer to a particular victim of a

particular crime like the second clause does, but instead applies

generally to federal "offenses." The Tanner requirement should

not be extended to a large area of criminal conspiracies, such as

mail and wire fraud, that victimize persons other than the

-15-

government or its agencies but traditionally have been prosecuted

under the "any offense" clause of 371. See United States v.

Falcone, 960 F.2d 988, 990 (11th Cir.) (en banc), cert. denied,

113 S. Ct. 292 (1992) (citing the reasoning in United States v.

Falcone, 934 F.2d 1528, 1548-51 (11th Cir. 1991) (Tjoflat, C.J.,

specially concurring, joined by Powell, Assoc. Justice, and

Kravitch, J.) to overrule its previous extension of Tanner to the

"any offense" clause of 371 in United States v. Hope, 861 F.2d

1574 (11th Cir. 1988)); United States v. Loney, 959 F.2d 1332,

1338-40 (5th Cir. 1992); United States v. Gibson, 881 F.2d 318,

321 (6th Cir. 1989). We therefore reject the contention that the

indictment must assert that the United States or one of its

agencies was a target of the alleged conspiracy in this case.

III. MULTIPLICITY OF THE BANK FRAUD COUNTS

Defendants challenge the validity of the indictment for

charging twenty-five individual counts of bank fraud under 18

U.S.C. 1344, when, allegedly, all the counts relate to the

single execution of one scheme to defraud Bay Loan. An

indictment is multiplicitous and in violation of the Fifth

Amendment's Double Jeopardy Clause if it charges a single offense

in more than one count. United States v. Serino, 835 F.2d 924,

930 (1st Cir. 1987). Under the bank fraud statute, 18 U.S.C.

1344, each execution of a scheme to defraud constitutes a

separate indictable offense. United States v. George, 986 F.2d

1176, 1179 (8th Cir.), cert. denied, 114 S. Ct. 269 (1993);

United States v. Lemons, 941 F.2d 309, 317 (5th Cir. 1991). The

-16-

central question for determining multiplicity is "whether a jury

could plausibly find that the actions described in the [disputed]

counts of the indictment, objectively viewed, constituted

separate executions of the [bank fraud] scheme." United States

v. Lilly, 983 F.2d 300, 303 (1st Cir. 1992).

A number of factors are relevant in determining whether

a single or multiple executions of bank fraud have taken place,

including the number of banks, the number of transactions, and

the number of movements of money involved in the scheme. Lilly,

983 F.2d at 305. Each time an identifiable sum of money is

obtained by a specific fraudulent transaction, there is likely to

be a separate execution of the scheme to defraud. See, e.g.,

United States v. Barnhart, 979 F.2d 647, 650-51 (8th Cir. 1992);

United States v. Mason, 902 F.2d 1434, 1436-38 (9th Cir. 1990);

United States v. Poliak, 823 F.2d 371, 372 (9th Cir. 1987), cert.

denied, 485 U.S. 1029 (1988).

The government's position is that each transaction in

which Bay Loan provided a mortgage (or end loan) to a buyer on

the basis of a fraudulent representation of a down payment

constitutes a single, independent execution of the scheme to

defraud. We think that this position is the correct one when the

scheme is viewed properly from an objective standpoint. See

Lilly, 983 F.2d at 303 (finding that the scheme should be

"objectively viewed" to determine multiplicity).

The basic scheme to defraud Bay Loan involved the

fraudulent representation of buyers' down payments in order to

-17-

obtain loan financing from the bank for Dean Street's condominium

units. The scheme was not designed to get a set amount, or a

preconceived sum, of money. Instead, the scheme functioned by

obtaining as many loans as possible depending on the number of

buyers Dean Street could recruit to apply for the mortgages. The

structure of the scheme was such that individual buyers would be

brought in to submit separate loan applications which would be

fraudulently prepared and then sent on to Bay Loan for approval

and the disbursement of the funds for that individual sale. Bay

Loan approved each loan separately based on each individual

application and each loan corresponded to an individual piece of

property, that is, a separate condominium unit. Objectively

viewed, each loan application appears to be a repeated execution

of the basic scheme and not simply an additional step or stage of

one unitary transaction. Although only one bank was involved in

the scheme, there were over 176 separate loans to 79 different

buyers involving many separate movements of money from Bay Loan

to the mortgage brokers and from the mortgage brokers to Dean

Street during the fifteen months in which the scheme was in

operation.

The fact that the end loans were sometimes processed in

bulk does not alter the essential nature of the scheme.

Defendants highlight the fact that, on some occasions, groups of

mortgage applications were supplied to Bay Loan together and Bay

Loan sometimes wired money to the brokers on a bulk basis. This

was usually done, however, as a matter of convenience (such as

-18-

when several unit purchases closed at the same time) and not as a

method to package the financing in a way necessary to accomplish

a unified scheme.9 Arguably, one could view this case as a

single execution by Dean Street of a broad scheme to use various

buyers as fronts in order to get financing for a unitary motel

condominium project. However, we feel it makes more sense to

look at each mortgage application as an individual attempt to

fraudulently obtain distinct amounts of money from Bay Loan.

This is not, as defendants assert, a situation like the

one in Lilly where a group of fraudulent mortgages was assigned

in a single package of documents to the defrauded bank as

security for one sum of money used to buy a single apartment

complex. See id. at 302-305. In that case, there was one

transaction with the defrauded bank which was executed "in order

to obtain a single loan, the proceeds of which funded a single

real estate purchase." Id. at 303. Consequently, we found the

charges based on each mortgage to be multiplicitous. The present

case is more akin to a check kiting scheme which we characterized

in Lilly as involving multiple executions of a fraudulent scheme

because more than one bank was involved and because, "[m]ore

9 At one point, Brandon could not guaranty clear title to Bay
Loan on the condominium units until he sold enough units and
obtained a large enough chunk of financing to pay off some of the
original mortgages used to buy the motels in the first place.
This did necessitate bulk processing of unit mortgages so that
blocks of financing could be obtained at one time. The execution
of the fraud, however, still remained the submission of
individual loan applications as additional buyers were recruited.
The block processing of loans did not correspond to one loan for
each motel but were instead an amalgamation of individual loans
for individual condominium units.

-19-

importantly, each check signifies a separate transaction

requiring a separate issuance of money or credit on the part of

the victimized bank." Id. at 304.

Similarly, the other cases cited by defendants that

invalidate indictments on grounds of multiplicity involve single

loan transactions instead of the multiple and separate loans

fraudulently obtained in this case. See United States v. Saks,

964 F.2d 1514, 1526 (5th Cir. 1992) (single loan transaction for

single piece of property); United States v. Heath, 970 F.2d 1397,

1401-02 (5th Cir. 1992), cert. denied, 113 S. Ct. 1643 (1993)

(two loans involved in the case "were integrally related; one

could not have succeeded without the other" and both were used to

accomplish essentially one integrated real estate transaction);

Lemons, 941 F.2d at 316-18 (separate payments of loan proceeds to

defendant were installments from a single loan transaction

involving a single project). We hold, therefore, that each end

loan provided by Bay Loan was the result of a separate fraud upon

the bank which the indictment properly charged as an individual

bank fraud offense.

IV. SUFFICIENCY OF THE EVIDENCE

Seven of the eight defendants argue that the evidence

introduced at trial was insufficient to support their convictions

for bank fraud and conspiracy to commit bank fraud.10 They

10 Brandon does not challenge the sufficiency of the evidence
against him on appeal. He does argue that certain evidentiary
rulings deprived him of a fair trial because he was unable to
present his theory of the case and convince the jury of his
innocence. This issue is discussed below in Section VII. We

-20-

argue, with individual variations, that they did not have the

requisite knowledge and intent to defraud Bay Loan because they

did not know of, or intend to violate, any down payment

requirements of the bank. With the few exceptions previously

noted, we disagree. Before reviewing the evidence with respect

to each defendant, we must first address some issues regarding

the substantive offenses charged in this case.

A. The Offenses

1. Bank Fraud

To prove bank fraud under 18 U.S.C. 1344,11 the

prosecution must show beyond a reasonable doubt that the

defendant (1) engaged in a scheme or artifice to defraud, or made

note for the record that the evidence against Brandon is not only
sufficient but overwhelming.

11 At the time when the offenses occurred, 18 U.S.C. 1344
provided:

Whoever knowingly executes, or attempts
to execute, a scheme or artifice -- (1)
to defraud a federally chartered or
insured financial institution; or (2) to
obtain any of the moneys, funds, credits,
assets, securities, or other property
owned by, or under the custody or control
of a federally chartered or insured
financial institution, by means of false
or fraudulent pretenses, representations,
or promises; [shall be guilty of an
offense against the United States].

A technical amendment in 1989 deleted the words "federally
chartered or insured" from the section leaving just "financial
institution." Pub. L. No. 101-73, Title IX, 961(k), Aug. 9,
1989, 103 Stat. 500. Apparently, no substantive change was
intended by this amendment as the definition of "financial
institution" for all of Title 18, now contained at 18 U.S.C.
20, still encompasses federally chartered or insured
institutions.

-21-

false statements or misrepresentations to obtain money from; (2)

a federally insured financial institution; and (3) did so

knowingly. United States v. Goldblatt, 813 F.2d 619, 623-24 (3rd

Cir. 1987); United States v. Cloud, 872 F.2d 846, 850 (9th Cir.),

cert. denied, 493 U.S. 1002 (1989). The terms "scheme" and

"artifice" are defined to include "any plan, pattern or cause of

action, including false and fraudulent pretenses and

misrepresentations, intended to deceive others in order to obtain

something of value, such as money, from the institution to be

deceived." Goldblatt, 813 F.2d at 624 (citing United States v.

Toney, 598 F.2d 1349, 1357 n.12 (5th Cir. 1979), cert. denied,

444 U.S. 1033 (1983)). "The term 'scheme to defraud,' however,

is not capable of precise definition. Fraud instead is measured

in a particular case by determining whether the scheme

demonstrated a departure from fundamental honesty, moral

uprightness, or fair play and candid dealings in the general life

of the community." Goldblatt, 813 F.2d at 624; see also United

States v. Stavroulakis, 952 F.2d 686, 694 (2d Cir.), cert.

denied, 112 S. Ct. 1982 (1992).

The alleged scheme in this case is the fraudulent

representation of down payments that were not actually paid in

order to obtain loan financing from Bay Loan. There is little

doubt that this scheme took place.12 Defendants argue,

12 Sufficient evidence exists to indicate Bay Loan provided the
loans for the Dean Street project, required down payments for the
loans, and approved loans and disbursed money based on the
understanding that its lending requirement was satisfied. The
evidence also clearly establishes that no down payments were

-22-

however, that they did not know of, or participate in, the

scheme, and, to the extent that they did participate in

activities related to the scheme, such actions were not illegal

because the actions were not intended to deceive or defraud Bay

Loan. Defendants claim they were either unaware that Bay Loan

existed or else unaware that Bay Loan had a down payment

requirement that prohibited the various down payment transactions

in which they were involved. The central issue on appeal,

therefore, is whether defendants possessed the requisite

knowledge and intent.

"To act with the 'intent to defraud' means to act

willfully, and with the specific intent to deceive or cheat for

the purpose of either causing some financial loss to another, or

bringing about some financial gain to oneself." Cloud, 872 F.2d

at 852 n.6 (citations omitted) (finding intent to defraud where

defendant signed instructions "knowing that the bank could be

deceived by materially false statements that appeared on the face

of the instructions"); see also United States v. Saks, 964 F.2d

1514, 1518 (5th Cir. 1992). "It is a well-established principle

that fraudulent intent may be established by circumstantial

evidence and inferences drawn from all the evidence." Cloud, 872

actually made to Dean Street because the payments were either
falsified or quickly returned to their source. Defendants did
present evidence, mostly testimony by Brandon himself, that Bay
Loan knew and approved of the down payment arrangements.
However, more than sufficient evidence points to the contrary
conclusion including the unequivocal testimony of Bay Loan's Vice
President, Gormley, that the bank never knew of nor approved of
the skirting of the down payment requirement.

-23-

F.2d at 852 n.6 (citations omitted); United States v. Celesia,

945 F.2d 756, 759-60 (4th Cir. 1991); see also United States v.

Mason, 902 F.2d 1434, 1442 (9th Cir. 1990) ("Specific intent is

established by 'the existence of a scheme which was reasonably

calculated to deceive persons of ordinary prudence and

comprehension, and this intention is shown by examining the

scheme itself.'" (quoting United States v. Green, 745 F.2d 1205,

1207 (9th Cir. 1984) (additional internal quotation omitted))).

Defendants argue that the government must prove that

they knew that the victim of their fraud was a federally insured

financial institution. We disagree. The status of the victim-

institution is not a separate knowledge element of bank fraud

under 1344 but an objective fact that must be established in

order for the statute to apply. The government produced

evidence, and defendants do not dispute, that Bay Loan is

federally insured. This is sufficient to satisfy the requirement

under 18 U.S.C. 1344 that the defrauded bank be a federally

insured bank. See United States v. McClelland, 868 F.2d 704,

709-11 (5th Cir. 1989); cf. United States v. Thompson, 811 F.2d

841, 844 (5th Cir. 1987) (finding that under 18 U.S.C. 1014,

which criminalizes the making of false statements to a bank, the

federal insured status of the victim institution is just a

jurisdictional requirement and not a knowledge element of the

offense); United States v. Trice, 823 F.2d 80, 86-87 (5th Cir.

-24-

1987) (same).13

We decline to adopt defendants' analogy to one of the

federal gambling statutes, 18 U.S.C. 1084(a), which we have

previously held requires knowledge of the interstate nature of

the wire communication involved in the offense. United States v.

Southard, 700 F.2d 1, 24-25 (1st Cir.), cert. denied, 464 U.S.

823 (1983). Our holding in that case rested on the fact that the

word "knowingly" in the statute could not reasonably refer to

anything else except the interstate nature of the communication.

Id. at 24 (noting one cannot unwittingly or unknowingly make a

wire transmission). That is not the case with the bank fraud

statute because "knowingly" in 1344 clearly applies to the

13 We find the language of 1014 sufficiently similar to 1344
to warrant a similar conclusion about Congress' intent with
respect to the knowledge requirement in the bank fraud statute.
18 U.S.C. 1014 states in pertinent part:

"Whoever knowingly makes any false
statement or report, or willfully
overvalues any land, property or
security, for the purpose of influencing
in any way the action of . . . any
institution the accounts of which are
insured by the Federal Deposit Insurance
Corporation [shall be guilty of an
offense against the Unites States]."

Defendants contend that the use of "knowingly" in this statute
differs significantly from its use in 1344 which prohibits
knowingly executing a scheme "to defraud a federally chartered or
insured financial institution." We reject this contention. The
placement in 1344 of the words "federally chartered or insured"
before the word "institution" instead of similar language being
placed after "institution," as in 1014, simply reflects the
fact that federal insurance is separately defined in another
subsection and thus there is no need to use the more awkward
construction found in 1014. The different word placement is a
distinction without a difference.

-25-

execution of a scheme or artifice to defraud. The word

"knowingly" is necessary because one can execute a scheme without

knowing or understanding that it is fraudulent. In fact, that is

what many of the defendants themselves argue in this appeal: that

they may have facilitated the false down payments but they did

not know it violated the bank's requirements. Therefore,

"knowingly" in 1344 has independent meaning without reference

to the federally insured status of the financial institution.

The defendants in this case also argue that the

government must prove they knew that the end loans were provided

by Bay Loan and not by some other institution, such as Homeowners

or East West. In other words, there was no violation of 1344

because the scheme to defraud was not knowingly targeted at a

federally insured financial institution, but instead at the non-

federally insured mortgage brokers.

Defendants overstate the government's burden. The

specific intent under 1344 is an intent to defraud a bank, that

is, an intent to victimize a bank by means of a fraudulent

scheme. See United States v. Stavroulakis, 952 F.2d 686, 694 (2d

Cir. 1992); United States v. Mason, 902 F.2d 1434, 1442 (9th Cir.

1990). It has been established that the government does not have

to show the alleged scheme was directed solely toward a

particular institution; it is sufficient to show that defendant

knowingly executed a fraudulent scheme that exposed a federally

insured bank to a risk of loss. See, e.g., United States v.

Barakett, 994 F.2d 1107, 1110-11 (5th Cir. 1993), petition for

-26-

cert. filed, (Sept. 22, 1993) (fraudulent scheme directed at

checking account customers of bank but fraud victimized bank as

well); United States v. Morgenstern, 933 F.2d 1108, 1114 (2d Cir.

1991), cert. denied, 112 S. Ct. 1188 (1992) (direct object of the

fraud was to steal money from third parties with deposits at the

defrauded bank).

We hold that it is also unnecessary for the government

to prove that a defendant knows which particular bank will be

victimized by his fraud as long as it is established that a

defendant knows that a financial institution will be

defrauded.14 The bank fraud statute was "designed to provide

an effective vehicle for the prosecution of frauds in which the

victims are financial institutions that are federally created,

controlled or insured." S. Rep. No. 225, 98th Cong., 2d Sess.

377 (1983), 1984 U.S. Code Cong. & Admin. News 3517. In creating

the statute, Congress noted that "there is a strong Federal

interest in protecting the financial integrity of these

institutions, and the legislation in this part would assure a

basis for Federal prosecution of those who victimize these banks

through fraudulent schemes." Id. Thus, Congress intended to

criminalize bank frauds that harm federally insured banks, not

14 We also reject a related claim made by several defendants
that the district court had no jurisdiction over their bank fraud
counts because the target of the alleged bank fraud -- Homeowners
or East West as opposed to Bay Loan -- was not a federally
insured financial institution. Bay Loan was in fact victimized
by defendants' scheme to defraud. In addition, the scheme was
designed to obtain funds from Bay Loan in particular by
fraudulently avoiding one of Bay Loan's requirements. This more
than satisfies the requirements for federal jurisdiction.

-27-

just bank frauds directed specifically toward federally insured

banks. As other courts have noted, "the legislative history

supports a broad construction of the statutory language" of the

bank fraud statute. Mason, 902 F.2d at 1442; see also

Stavroulakis, 952 F.2d at 694.

Defendants are essentially seeking to sanitize their

fraud by interposing an intermediary or an additional victim

between their fraud and the federally insured bank. We reject

this attempt to escape the reach of the bank fraud statute.

Instead, we find that defendants need not have had the specific

intent to defraud Bay Loan so long as they intended to defraud

some financial institution. The fact that it should turn out

that the financial institution actually defrauded was federally

insured is a fortuitous stroke of bad luck for the defendants but

does not make it any less of a federal crime. In this case,

evidence beyond a reasonable doubt that defendants fraudulently

evaded a known down payment requirement, whether thought to be

imposed by Homeowners, East West, Bay Loan or some other

financing entity, is sufficient to support a bank fraud

conviction. Of course, the government must also establish that a

federally insured bank, Bay Loan, was victimized or exposed to a

risk of loss by the scheme to defraud. See United States v.

Blackmon, 839 F.2d 900, 906 (2d Cir. 1988). This, however, is

not seriously disputed in this case.15

15 The down payment scheme victimized Bay Loan because it
devalued the mortgages that the bank was providing. Down
payments on a loan decrease the risk of default or nonrepayment

-28-

Concerns about extending the reach of the bank fraud

statute into broad new areas of financial activity stem from a

misunderstanding of the nature of the statute. Financial

transactions are becoming increasingly integrated and complex as

more and more financial instruments are securitized and traded on

national and global markets. Consequently, the effects of

fraudulent actions against one institution are increasingly

likely to spill over and detrimentally affect others. As

Congress' main concern in 1344 was to provide jurisdiction for

fraudulent schemes that harmed federally chartered or insured

institutions, the increased risks to the institutions should be

matched by increased coverage of the statute. We are not

federalizing criminal transactions previously covered only by

state law so much as recognizing that those criminal transactions

by increasing the equity participation of the borrower and giving
the borrower a larger stake in the venture. The down payments
consequently have value to the lender bank and the failure to
make them deprives the bank of this value. Cf. Mason, 902 F.2d

at 1441-43 (finding intent to commit bank fraud where bank
exposed to risk of loss through defendants' concealment from the
bank that its customers were purchasing prostitution services and
consequently were a greater credit risk to the bank which was
processing the customers' credit card purchases from defendants'
escort service).

The fact that buyers were required to make their down payments
to the seller, Dean Street, does not mitigate the risk of loss to
Bay Loan from the down payment scheme. There would still be a
higher risk of default and the absence of equity participation
regardless of who was receiving, or failing to receive, the down
payments. In addition, the value of the condominiums, the bank's
collateral, becomes an issue where the bank, thinking it is only
providing 80% of the purchase price, is actually lending 100% of
the sale price. Ultimately, Bay Loan refused to provide 100%
financing and explicitly required a down payment; the payment
became a negotiated term of the mortgage contract and thus had
some value to Bay Loan.

-29-

are becoming more federal in nature.16

An additional argument defendants make is that the

government must prove defendants knew that Bay Loan's down

payment requirement specifically prohibited the funding of

buyers' down payments by someone other than the buyer.

Defendants claim that they thought the funding of buyer down

payments was just some complex financial arrangement,

"supplemental financing" or required paperwork, and they did not

know the funding was designed to defraud the bank.

This misrepresents the nature of the fraud. Although

Bay Loan did in fact prohibit third party funding of down

payments, the key misrepresentation in this case was that the

required down payments were being paid when they actually were

not. Bay Loan required the buyers to make down payments to the

seller, Dean Street, and the existence of the payments was

represented to the bank on the closing settlement sheets. In

reality, the payments were not being made, either because no

funds were actually transferred or because the funds were

16 We do not address whether any scheme to defraud, regardless
of its intended victim, can be prosecuted under the bank fraud
statute as long as it has some detrimental effect on a federally
insured bank. In this case at least, the government did prove
the scheme was intended to defraud a financial institution:
Homeowners or East West, if not Bay Loan itself.

We also do not address possible statutory or jurisdictional
limitations on the remoteness or foreseeability of the harm or
the risk of loss to federally insured financial institutions
beyond which 1344 will no longer apply. We simply note that
this case presents a situation of direct harm to Bay Loan
resulting from a scheme specifically designed to fraudulently
avoid the requirements of that federally insured bank in order to
obtain funds originating directly from Bay Loan.

-30-

returned by Dean Street to their source.17 Therefore, the

government need only prove that defendants knew a down payment

was required and that no real down payments were actually made.

It need not establish that defendants knew all of the specifics

of the down payment requirement such as restrictions on third

party funding.

In sum, to prove defendants knowingly engaged in the

fraud, the government must establish that each defendant knew

that some financial institution was lending the money for the

motel-condominium project, knew that a down payment was required

for these loans, knew that a scheme of one sort or another

existed to make it appear that the down payments were being made

when in fact they were not, and finally, that each defendant

willfully participated in that scheme.

2. Conspiracy

Each defendant contests the sufficiency of the evidence

of his or her knowledge of the conspiracy to defraud Bay Loan and

his or her level of participation in that agreed upon scheme. To

prove conspiracy, the government must show the existence of an

agreement between defendant and another to commit a crime,18

17 In those cases where Dean Street failed to repay down payment
funds as promised, the intention was still to do so and to
execute the same fraud as was executed on the other unit sales.

18 To the extent that the existence of a conspiracy is at issue,
the evidence is overwhelming to support the convictions. A
conspiracy is an agreement to commit a crime and may be inferred
from the circumstances. United States v. Concemi, 957 F.2d 942,

950 (1st Cir. 1992). Brandon planned and executed a complex
scheme to defraud Bay Loan that required the cooperation of
investors, brokers, and other agents involved in facilitating the

-31-

that each defendant knew of the agreement, and that each

defendant voluntarily participated in the conspiracy through

conduct that was interdependent with the actions of the other

conspirators. United States v. G mez-Pab n, 911 F.2d 847, 852-53

(1st Cir. 1990), cert. denied, 498 U.S. 1074 (1993); United

States v. Evans, 970 F.2d 663, 668 (10th Cir. 1992), cert.

denied, 113 S. Ct. 1288 (1993). The defendants must have both

the intent to agree to participate in the conspiracy and an

intent to commit the underlying substantive offense. G mez-

Pab n, 911 F.2d at 853; United States v. Drougas, 748 F.2d 8, 15

(1st Cir. 1984). The government, however, need not prove that

each defendant knew all of the details and members, or

participated in all of the objectives, of the conspiracy as long

as it can show knowledge of the basic agreement. G mez-Pab n,

911 F.2d at 853; United States v. Marsh, 747 F.2d 7, 13 (1st

Cir. 1984). Such proof of knowledge and intent "may consist of

circumstantial evidence, including inferences from surrounding

circumstances, such as acts committed by the defendant that

furthered the conspiracy's purposes." G mez-Pab n, 911 F.2d at

853.

The government must also establish defendants'

participation in the conspiracy with the intent to further the

transactions. Brandon told several co-conspirators of his plans
to falsify down payments, including Marderosian, Reisch, Gauvin,
Granoff, Hagopian, and Ward. The evidence indicates these
defendants agreed to become involved in the conspiracy by
performing such critical tasks as drawing up mortgage discharges,
wiring money, and providing down payment checks that would not be
used.

-32-

aims of the conspiracy. Direct Sales Co. v. United States, 319

U.S. 703, 712 (1943). Once a conspiracy is established, as well

as defendant's intent to further it, any connection between the

defendant and the conspiracy, even a slight one, will be

sufficient to establish knowing participation. Marsh, 747 F.2d

at 13.

In this case, the government must prove that the

defendants knew there was an agreement to fraudulently represent

down payments in order to get loans from Bay Loan and that they

willfully participated in this scheme by taking some overt action

with the intent to further the scheme's objective. Thus, the

evidence must be sufficient to establish the intent to commit

bank fraud as discussed above and, in addition, must also

establish an intent to commit the fraud in conjunction with the

broader conspiratorial agreement.

B. The Case Against Each Defendant

Our task on review of the verdicts is to examine the

evidence in its entirety in the light most favorable to the

government to determine whether a rational trier of fact could

have found the essential elements of the crime beyond a

reasonable doubt. The government receives the benefit of all

legitimate and favorable inferences, and it can prove its case by

circumstantial evidence without having to exclude every

reasonable hypothesis of innocence. United States v. McLaughlin,

957 F.2d 12, 18 (1st Cir. 1992); United States v. Boldt, 929 F.2d

35, 39 (1st. Cir. 1991); United States v. Van Helden, 920 F.2d

-33-

99, 101 (1st Cir. 1990). Below, we review each defendant's case

individually.

1. Marvin Granoff

Granoff was convicted of conspiracy and two counts of

bank fraud in connection with his purchase of units on one

occasion and with his funding of buyer down payments on another

occasion. Granoff argues that the evidence in this case is

insufficient to show that he was anything more than an innocent

investor duped by his lawyer, Marderosian, into providing money

for a project he really did not know anything about. Although

the evidence against Marvin Granoff reveals a more circumscribed

role than some of the other defendants, we are not prepared to

overturn the jury's guilty verdict on either the conspiracy

charge or on the two counts of bank fraud.

Sufficient evidence supports the jury's conclusion that

Granoff knew Bay Loan was funding Dean Street's condominium

project, that he knew down payments were required from the buyers

and that he knowingly participated in a scheme to deceive the

bank into thinking the requirement was satisfied. To begin with,

Granoff bought four units on one occasion and provided down

payment funds on another occasion. Both times Bay Loan financed

the purchases without knowing the required down payments were not

actually made. Prior to each of these transactions, Granoff

attended a series of meetings with Brandon concerning the motel

condominium scheme. Brandon told Granoff that down payments were

required and that he needed Granoff to provide money for the down

-34-

payments of other buyers.19 Granoff agreed to do so.20

For Granoff's purchase of units at the Charlestown Inn

19 Specifically, Marderosian testified that Brandon told Gauvin
and Granoff in the summer of 1987 that "Homeowners required a
twenty-five percent down payment and while that down payment
would not be required of Mr. Gauvin and Mr. Granoff, he did have
the problem of the down payment with subsequent purchasers and he
asked Mr. Gauvin and Mr. Granoff for their assistance in meeting
that problem." Despite the offer to "waive" Gauvin and Granoff's
down payments, checks representing down payments were required
for their purchases.

In another meeting, Brandon asked Gauvin and Granoff if they
were "willing to provide the down payment money for other
purchasers" and they agreed to do so. Marderosian also testified
that Brandon told Granoff at a meeting in January of 1988 that he
needed someone to provide funding for the certified down payment
funds required from unit buyers. Brandon asked whether Gauvin
and Granoff were "interested in providing those certified funds"
and they agreed.

20 Marderosian testified that Granoff agreed on several
different occasions to participate in Brandon's scheme and
referred several times to the "agreement Mr. Gauvin and Mr.
Granoff made to provide Mr. Brandon with monies for the down
payments." Despite this, Granoff argues that Marderosian's
testimony indicates Granoff said little or nothing at the various
meetings with Brandon and this is insufficient to establish
Granoff agreed to participate in the conspiracy. The fact that
Granoff provided $470,000 that was used for down payments
following the meetings with Brandon in which the agreement was
discussed, however, is sufficient to support the conclusion that
Granoff in fact did agree and did participate in the conspiracy.

Furthermore, Granoff's involvement in the conspiracy was more
than just the provision of goods and services to an operation
that he knew might use the funds illegally. See Direct Sales Co.

v. United States, 319 U.S. 703, 711, 713 (1943); United States v.

Falcone, 109 F.2d 579, 581 (2d Cir.), aff'd, 311 U.S. 205 (1940).

The evidence, as we discuss below, indicates that Granoff
provided money specifically for the purpose of funding down
payments he knew would be falsified and was promised $1000 per
unit for his efforts. Granoff's provision of down payment funds
was a specialized transaction without loan documents or other
paperwork and did not constitute merely the provision of goods or
services to the conspiracy. Overall, the evidence is more than
adequate to support the finding that Granoff adopted the goals of
the conspiracy as his own and provided the down payment funds to
further the conspiracy.

-35-

in August of 1987, his partner, Gauvin, provided down payments to

Dean Street on Granoff's behalf in the form of checks that were

not backed by sufficient funds. Copies of the checks were

included in the closing files. The "payments" were returned to

Gauvin two days later when Dean Street wrote identical checks

back to Gauvin which Gauvin deposited in his account to cover the

original down payment checks. The fact that Gauvin's checks,

totalling $246,000, were drawn on an account with only $6000 at

the time when they were written indicates that there was no

intent on Gauvin's part to make an actual down payment in the

first place.21

Granoff likewise provided down payment funds for other

buyers and the evidence indicates he did this knowing and

expecting that the money would be returned to him after the

closing. Granoff provided $470,000 for down payments on the

21 Granoff argues that with respect to Count 2, charging him
with bank fraud in connection with his purchase of a unit at the
Charlestown Motor Inn, the requisite knowledge element was not
established. Brandon had told Granoff that the down payment
would be waived for his purchase and there was nothing, Granoff
claims, in the closing procedure sufficient to support the
conclusion that he knew his purchase took place under fraudulent
pretenses. On the contrary, even if we disregard the reasonable
possibility that Granoff's partner, Gauvin, told Granoff all
about the complex recycling transaction Gauvin undertook with the
checks used for Granoff's down payment, the fact that Granoff
signed the HUD settlement sheets establishes a sufficient basis
to conclude Granoff knew he was representing the existence of
down payments that he was not actually paying. The HUD
settlement sheet for Granoff's purchases clearly indicated that a
$20,500 down payment was being paid by the buyer. If indeed
Granoff was under the impression, up to that point, that the down
payment had been "waived," the $20,500 figure on the closing
documents must have tipped him off that something suspicious was
going on.

-36-

Atlantic Inn-Westerly units in the form of two checks, one for

$270,000 from Marvin Granoff Real Estate and another for $200,000

from Granoff's Eastern Wire Products Co. In turn, Brandon

promised to pay Granoff $1000 for each unit sold using Granoff's

down payment money.

As it turns out, Granoff was never paid back, but the

evidence shows that Granoff expected and intended for this money

to be promptly returned to him after the closings. A recycling

arrangement had been used earlier for Granoff's own purchase, and

for subsequent purchases funded by Gauvin, under the initial

agreement between Granoff, Gauvin, and Brandon. More

importantly, about two weeks after the first closings involving

Granoff's $470,000, Gauvin sent a letter to Marderosian, on

Manchester Associates22 letterhead, complaining that the

transaction involving the $470,000 was taking too long. The

letter stated that the transaction involving Granoff's $470,000

"was to take at most two to three days." Marderosian also

testified that on a different occasion, Gauvin told Marderosian

that Gauvin and Granoff "can make money without putting up any

money." In addition, there was no promissory note or other

formal documentation to indicate that the $470,000 was normal

loan financing.23 Consequently, Granoff knew that his money

22 Manchester Associates was a partnership formed by and
consisting of Gauvin and Granoff.

23 Gauvin and Granoff documented a previous loan to Brandon for
the smaller sum of $200,000 indicating that if they really
intended the money to be a loan instead of a tool to show down
payments through a recycling transaction, they would have

-37-

was used to create the appearance that down payments were being

paid when in fact they were not; they were being falsified.

The arrangement of rapidly recycling "down payment"

funds through Dean Street meant that, in reality, no down

payments were being made at all. A paper trail was left in the

closing files indicating that the buyer had made a down payment

to the seller, Dean Street, when, in fact, the seller just

returned the money to its source, effectively rendering that

paper trail fraudulent. Bay Loan's down payment requirement was

thus avoided without the bank's knowledge. As a knowing

participant in this recycling scheme, Granoff possessed the

necessary intent to defraud and the requisite level of

involvement in the larger conspiracy to be found guilty of the

offenses charged.

Although not essential for upholding Granoff's

conviction, we also find that the evidence is sufficient to show

that Granoff knew Bay Loan was loaning the money for the

condominium units. Granoff bought four units financed by Bay

Loan and he put up nearly half a million dollars to provide down

payment funds for other units to be purchased with Bay Loan

financing. Homeowners furnished a letter at the closings

including the closing on Granoff's purchases, which Granoff

attended, stating that Homeowners had "transferred all of its

documented it.

-38-

rights and interests" in the mortgage to Bay Loan.24 Granoff

had occasion to see the letter and it is not unreasonably to

assume he also read it.

Granoff also attended a number of planning meetings

with Brandon in which plans for closing on various units, the

funding of down payments, and other details of the scheme were

discussed. The evidence also indicates Granoff was continually

kept abreast of various detail of Brandon's scheme; details, one

could infer, that included the source of the financing. In the

last half of 1987, Granoff and Gauvin formed a partnership called

Manchester Associates for the purpose of real estate investment.

On behalf of Manchester Associates, Gauvin met several times with

Brandon who discussed his overall plans to close on over 400

motel units as well as the schedule for those closings. Letters

referencing these meetings were written on Manchester letterhead

and one could reasonably infer that Gauvin related the substance

of the meetings to his partner Granoff.25 One such letter from

24 There is some dispute whether this letter, which was not
signed by the parties, was included among the documents at the
closings. Homeowners' Vice President, Gregory Cambio, testified
that the letter "was part of the closing package" but also
testified that it may have been sent after the closing. The
trial exhibits containing the loan files for each of Granoff's
purchases do contain the letter which is dated on the same date
as the closing. However, the file contains both closing
documents, signed by Granoff, as well as other documents that may
or may not have been at the closing. The letter, therefore, is
not dispositive of Granoff's knowledge, but does provide some
evidence of knowledge that can be considered in conjunction with
the other circumstantial evidence.

25 For example, Granoff was cc'd on a letter to Dean Street that
referenced plans to close on 107 units and discussed the
repayment of Granoff's $470,000.

-39-

Gauvin states that "it would seem that the lending institutions

will be in a position to begin closing." As Homeowners and Bay

Loan were the only institutions involved at the time the letter

was written, the plural reference to "institutions" indicates

that Gauvin and his partner, Granoff, were aware not only of

Homeowners but of Bay Loan as well.

In sum, the evidence indicates that Granoff was aware,

on a fairly detailed level, of a large real estate scheme whose

only source of funding happened to be Bay Loan. With substantial

sums of his own money at stake in this extensive project, Granoff

was likely to become aware at some point of the source of money

behind it all. It is not unreasonable to conclude, therefore,

that Granoff knew of Bay Loan's involvement in the project.

Furthermore, the fact that Bay Loan was providing the

financing was known to several others who, like Granoff, were

involved in buying and investing in the units. Brandon testified

that he was "completely open" about, and "made no secret" of, Bay

Loan's involvement. Although Brandon testified that he generally

told people outside Dean Street that the lender was Homeowners

and not Bay Loan, he also testified that he told Hagopian, Ward,

Reisch, and Limoges about Bay Loan's involvement. These people,

like Granoff, bought units or provided down payment funds and

were not Dean Street employees. Even an investor named Michael

Parvin, who bought only one unit, testified that he knew Bay Loan

was involved. It is not unreasonable, therefore, for a jury to

conclude that Granoff discovered this fact as well.

-40-

Granoff challenges any inferences of criminal knowledge

or intent drawn from the pool of circumstantial evidence as

impermissibly based merely on Granoff's association with his co-

defendants. He claims that amidst the fast-paced wheeling and

dealing of the 1980s real estate market, investors did not have

the ability to know all the details and purposes behind every one

of their transactions. It was common for investors to entrust

their money to developers and lawyers without learning any of the

specifics of the various projects in which they were involved.

Details such as the exact nature of a bank's down payment

requirement were not, Granoff implies, important enough to be

discussed between a developer and an investor. Add to these

circumstances the unscrupulous and deceptive acts of Brandon and

Marderosian, who allegedly got Granoff into this whole mess, and

Granoff contends that we cannot help but conclude he was lied to

about the true nature of the project.

While it may be true that the typical real estate

investor in the 1980s would readily put up hundreds of thousands

of dollars for "down payment funds," expect the money back in a

few days, and still not suspect he is defrauding a bank, we are

certainly not prepared, given the facts discussed above, to

preclude a jury from concluding otherwise. The government need

not disprove every reasonable hypothesis of innocence, provided

the record in its entirety supports the jury's verdict. United

States v. Ortiz, 966 F.2d 707, 714 (1st Cir. 1992), cert. denied,

113 S. Ct. 1005 (1993). In this case, the record does provide

-41-

the requisite support. Therefore, we affirm Granoff's

convictions.

2. Charles Gauvin

Gauvin was convicted of conspiracy and five counts of

bank fraud in connection with his purchase of several units and

his funding of buyer down payments. Gauvin was Granoff's

business partner and the more active of the two in their dealings

with Dean Street. According to the record, he knew at least as

much as Granoff, and most likely more, about the scheme to

defraud Bay Loan. Gauvin also participated to a greater extent

in the scheme than Granoff did. Consequently, there is no need

to discuss at length the evidence sufficient to support his

conviction.

The jury could have found that Gauvin knew Bay Loan was

providing loans for the condominium project and requiring down

payments for these loans based on the evidence of the several

meetings Gauvin attended and correspondence that he exchanged

with Brandon discussing the condominium projects and his

agreement with Brandon to provide buyers with down payment funds

that were required for the financing of the units. The jury

could infer that Gauvin knew the down payments were not in fact

being paid in violation of the bank's requirement, and that

Gauvin willfully participated in the scheme to accomplish this

fraud, based on the evidence that Gauvin: 1) delivered to Dean

Street twelve down payment checks backed by insufficient funds

for the Charlestown closings in August of 1987 and received

-42-

twelve equivalent checks back from Dean Street two days later

which he used to cover his original checks; 2) provided down

payment money for Reisch and others which was returned to him

within a matter of days; 3) commented to Marderosian that the

down payment checks he was providing "did not have to be backed

by good funds because the timing was so quick" and that he and

Granoff could "make money without putting up any money;" and 4)

delivered Granoff's $470,000 in down payment funds to Dean Street

and wrote in a subsequent letter to Brandon that he expected the

transaction involving those funds "to take at most two to three

days."

Gauvin argues that the evidence of his activities

clearly indicates a lawful intent in his writing the checks to

Dean Street. As he testified at trial, Gauvin thought he was

simply lending money to Dean Street for its condominium project

and he had no intention that his money be used for fraudulent

purposes. Evidence in the record indicates that "supplemental

financing," similar to what Gauvin thought he was providing to

Dean Street, was a standard practice in the industry. Gauvin

also testified that he was "surprised" to see his first twelve

checks come back so quickly. But Gauvin was not so surprised,

apparently, so as to be tipped off that anything illegitimate was

going on because such rapid turn around of loans was also a

standard practice during the real estate boom of the 1980s.

Gauvin suggests that maybe Dean Street was packaging the

secondary financing and selling it off at a profit, thus removing

-43-

Gauvin's participation as a lender fairly quickly.

Maybe, but then again, maybe not. The jury considered

Gauvin's arguments and decided that the evidence proved Gauvin

knew what was really happening at Dean Street. Our job on appeal

is to measure the sufficiency of that evidence and not to search

for every logical or rational conclusion that can be drawn.

Ortiz, 966 F.2d at 714. Gauvin was told several times that funds

were needed to make down payments for buyers. We find it rather

difficult, therefore, to believe Gauvin thought he was

legitimately loaning money for down payments when the recipient

of the payments was giving the money right back to the lender.

If Gauvin loaned money to a friend to buy a car and then had his

loan paid off by the car dealership, we might wonder about his

characterization of the transaction as normal financing. In the

present case, the suspicious nature of the transactions, combined

with evidence of the underlying scheme to defraud and an

agreement between Gauvin and the scheme's mastermind to

contribute funds to the scheme, is more than ample to support the

jury's verdict.

3. Norman Reisch

Reisch was convicted of conspiracy and seven counts of

bank fraud. The evidence against Reisch indicates that he knew

Bay Loan was financing the condominium units, that he knew down

payments were required for the condominium loans and that he

knowingly participated in a scheme to recycle funds through

buyers to make it look like these down payments were actually

-44-

being made. Reisch had "at least a dozen" discussions with

Brandon and Marderosian about the 20% down payment requirement

and ways that the "requirement might be satisfied by alternative

methods or might be avoided," including the use of second

mortgages and loaning the down payment money to the buyers.

Proof of Reisch's knowing participation in the

conspiracy is as follows. Reisch bought four Charlestown units

for which Gauvin provided the down payment funds. At the same

time, Reisch provided another buyer with down payment money for

three other units. Dean Street returned the money to Reisch the

next day. Reisch later agreed with Brandon to wire money for

down payments directly into buyers' accounts. After each closing

that utilized Reisch's wired funds, the down payment money was

returned to Reisch. On some occasions, the buyers' checks to

Dean Street, which were funded by Reisch, were endorsed directly

back over to Reisch. Reisch once remarked about this arrangement

"we would just have to keep bringing the funds back and rolling

them to wire more funds out for the projects."

As for Reisch's knowledge of Bay Loan, Brandon

testified that it was "very probable" that he told Reisch about

Bay Loan's involvement in the project during a conversation in

the summer of 1988. The jury could reasonably conclude that

Reisch had knowledge of Bay Loan even before this conversation.

Reisch's contact with Brandon and his involvement in the down

payment scheme was more significant than that of Granoff.

Because we found sufficient evidence to support the conclusion

-45-

that Granoff had knowledge of Bay Loan, we think that, for the

reasons discussed above, there is also sufficient evidence

against Reisch.

Like Gauvin and Granoff, Reisch argues that he was just

making loans that he thought were completely legal. Like Gauvin

and Granoff, we find this argument unconvincing, especially given

Reisch's greater involvement in the scheme. We reject, moreover,

Reisch's application of the holding in United States v. Falcone,

109 F.2d 579, 581 (2d Cir. 1940) (holding the mere delivery of

goods or services to a conspiracy does not constitute membership

in the conspiracy), to this case. Reisch's conduct amounted to

more than a mere delivery of loans to a conspiracy. The evidence

indicated that Reisch was involved in the planning of the down

payment scheme and that he played a key role in furthering the

success of a conspiracy that was starved for new funds before he

began supplying them. In particular, Reisch provided a specific

loan arrangement (involving a complex system of wired funds)

especially tailored to falsifying the down payments. Reisch's

actions thus were not limited to the mere provision of lending

services but instead were strong evidence of an intent to further

the conspiracy.

4. Ronald Hagopian

Hagopian was convicted of conspiracy and six counts of

bank fraud for his role as a broker for Dean Street who solicited

-46-

buyers and facilitated their purchases.26 The evidence against

Hagopian more than adequately establishes his knowledge of Bay

Loan's down payment requirement and his knowing participation in

various schemes to fraudulently represent the existence of those

down payments. To begin with, Brandon testified that he told

Hagopian about "his relationship" with Bay Loan, which

establishes Hagopian's knowledge that Bay Loan was providing the

financing. Hagopian knew a down payment was required for the

units by virtue of the fact that he provided a down payment check

for his own purchase, and he discussed down payments with some of

the buyers he recruited.27

Hagopian also knew about and participated in the scheme

to falsify the existence of the down payments. Hagopian

purchased several condominium units and wrote a corresponding

down payment check that Dean Street never negotiated. Hagopian

told the buyers he recruited that they needed to write checks to

Dean Street for the purchases of their units but that the checks

would either not be used or would be covered by Dean Street

itself.28 Hagopian also told some buyers that they would have

26 The court entered a mid-trial judgment of acquittal for
Hagopian on one count of bank fraud. Hagopian was also found not
guilty by the jury on two counts of bank fraud.

27 In addition, Hagopian's business partner, John Ward, who
rounded up buyers with Hagopian, told one of these buyers to give
Ward a check "for the down payment that was required."

28 In addition, Hagopian was present during several meetings
with Brandon including one where Brandon told a buyer that there
were no down payments. Hagopian also told this to the buyer.
The buyer eventually did produce a down payment check for his
purchase and the check was never negotiated. Hagopian was

-47-

second mortgages to cover part of their down payment but these

mortgages would later be discharged. All of these schemes were

actually executed with many of the buyers Hagopian solicited.

Sometimes Hagopian returned voided or nonnegotiated down payment

checks back to the buyers. Hagopian also told buyers they would

be paid for each unit they bought and he usually provided this

rebate money to the buyers he had solicited after the closings.

Hagopian adds a new twist to the familiar refrain that

he thought he was participating in a perfectly legal real estate

project. He claims that the fact he openly solicited buyers for

a "no money down" investment opportunity proves that he had no

knowledge that Brandon's down payment scheme defrauded the bank.

Hagopian placed public advertisements for the condominiums that

explicitly promised "no money down." Hagopian contends that

because Dean Street took care of all the financing, his job was

limited to soliciting buyers for a type of real estate investment

that was allegedly common at that time and not in any way

suspicious.29

subsequently asked about that check by the buyer who expected it
to be returned to him and was concerned it might actually be
cashed. Hagopian said he would look into it.

29 Hagopian makes a related argument that his conduct did not
further the conspiracy to a significant degree and that there was
not sufficient interdependence between Hagopian and the other
conspirators to establish that he joined the conspiracy as
required. United States v. Evans 970 F.2d 663, 670 (10th Cir.

1992); United States v. Horn, 946 F.2d 738, 740-41 (10th Cir.

1991). All that is required is that the alleged conspirator
facilitate the endeavors of other alleged co-conspirators or
facilitate the venture as a whole. See Evans, 970 F.2d at 670;

Horn 946 F.2d at 740-41. The government has more than met this

burden.

-48-

The evidence clearly supports the jury's conclusion

that Hagopian did more than innocently broker deals for Dean

Street. Hagopian told buyers of his "no money down" investment

opportunity to provide down payment checks that would not be

cashed and to sign mortgages that would be discharged. His

"openness" in advertising no money down investments simply shows

he was actively soliciting buyers to further the scheme. The

scheme relied on new faces to serve as frontmen for the

individual bank loans and Hagopian's actions were an integral

part of furthering the scheme's success.

Hagopian was not open about the fact that "no money

down" meant providing false paperwork to the bank so that it

would think down payments were actually being made. Regardless

of whether 100% financing was customary at the time and thus not

suspicious, the fake down payments and fake second mortgages were

certainly not customary (or if customary in the 1980s, still

illegal), and the jury was warranted in concluding that Hagopian

knew this. Finally, the jury could reasonably infer that the

public advertising was just a necessary, and minor, risk taken by

Hagopian to attract new buyers and not particularly convincing

evidence of his innocence.

5. John Ward

Ward was convicted of conspiracy and six counts of bank

fraud for purchasing a unit and for soliciting and facilitating

-49-

unit sales.30 The evidence against Ward, at least in terms of

knowledge and intent, is essentially the same as that against his

partner, Hagopian, and the two played essentially the same role

in the conspiracy. Brandon testified that he told Ward about

"his relationship" with Bay Loan. Ward also knew that down

payments were required as he was involved in many of the same

discussions with potential buyers that Hagopian was involved in.

Specifically, Ward told one buyer to give him a check "for the

down payment that was required."

Ward knew down payments were not actually being made as

his own down payment was not negotiated and he told one buyer,

whose down payment funds were to be wired into that buyer's

account, that the down payment check would be cashed the same day

so that the people wiring the funds "got their money back."

We reject Ward's assertion that he thought Bay Loan

approved all of the various down payment shenanigans in which he

was involved. Ward contends that the down payment arrangement

that he was aware of was simply a paperwork requirement and not a

"real" requirement; that is, Ward only knew that some sort of

paper representing down payments had to exist but thought no real

funds were actually required from the buyers. We suppose Ward's

contention is within the realm of the possible. However, the

jury looked at the intricate down payment arrangements and the

way Ward explained them to the buyers and found, quite reasonably

30 The district court entered a mid-trial judgment of acquittal
in favor of Ward on one count of bank fraud. The jury found Ward
not guilty on two additional counts of bank fraud.

-50-

we think, that Ward knew his actions were a "departure from

fundamental honesty." Goldblatt, 813 F.2d at 624. The common

sense understanding of a down payment is the transfer of actual

funds from the buyer to the seller or financier. With this in

mind, it is more than reasonable for a jury to find that once a

defendant learned of the structure of the down payment

arrangement used in this case, with no real down payments

changing hands, the defendant would be tipped off to the fact

that a fraudulent transaction was contemplated. Even if we

assume Brandon lied to Ward and told him that Bay Loan directed

Dean Street to arrange for paper, as opposed to real, down

payments, the evidence was sufficient to support a finding that

Ward knew he was engaging in a sham transaction.

The evidence is also sufficient to prove Ward's willful

participation in the overall conspiracy and Ward's execution of

the bank fraud scheme charged in Counts 9, 15, 18, and 19.31

However, the evidence is not sufficient to show that Ward took

any actions that would constitute the engagement in bank fraud

set forth in Counts 24 and 25 of the redacted indictment.32

Consequently we uphold the convictions on the former counts and

reverse the verdict against Ward on the latter two counts.

31 Count 9 charges bank fraud in connection with Ward's purchase
of a unit at the Bayside Motel. Counts 15, 18 and 19 charge bank
fraud in relation to unit purchases at the Sandpiper Motel and
the Hillside Motel that were facilitated by John Ward and others.

32 Counts 24 and 25 charged Ward and four other defendants with
defrauding Bay Loan by obtaining an end loan for the purchases of
units at the Sandcastle Motel by Bruce Schulbaum and John Mills,
III.

-51-

As stated in Count 9, Ward bought a condominium unit at

the Bayside Motel in October of 1987. The down payment check he

provided for the sale was never negotiated. This is sufficient,

given his knowledge discussed above, to support the conclusion

that Ward never intended to provide real funds for the down

payment but just paperwork to deceive the bank. Ward's

conviction for bank fraud on Count 9 is thus upheld.

The evidence is also sufficient to support the

conviction on Counts 15, 18 and 19 which each charged Ward with

bank fraud for facilitating the sale of a separate condominium

unit. Ward helped to solicit the buyers involved in the

transactions for these counts by telling them that no down

payments were required. He directed one of these buyers to

provide down a payment check that would be funded by someone else

and then cashed so that the funds could be returned. Ward

provided the buyers in Counts 15 and 18 with the rebates they

were promised for purchasing units. For the transaction in Count

19, the evidence indicates that Ward was the intermediary for the

funds wired by Brandon to cover the buyer's down payment.

Brandon's wire transfer was directed to the buyer's insurance

company to the attention of "John Ward." Thus, we uphold Ward's

convictions for conspiracy and on Counts 15, 18 and 19.

The evidence is not sufficient, however, to show that

Ward engaged in bank fraud with respect to the transactions in

Counts 24 and 25. Although Ward was present at the closings and

several of the meetings where down payment arrangements were

-52-

discussed for the sales in Counts 24 and 25, there is no evidence

that Ward said anything to these particular buyers or did

anything to otherwise facilitate their purchases.33 Ward did

not provide the buyers in Counts 24 and 25 with rebates as an

incentive to buy nor did he direct these buyers to falsify their

down payments.34 As such, Ward neither executed nor aided the

execution of the scheme to defraud in these two instances.

Because we see no evidence in the record to support any

reasonable finding by the jury that Ward played a role in

obtaining the loans in Counts 24 and 25, we reverse his

convictions for these two counts.

6. Owen Landman

Landman was convicted of conspiracy and six counts of

bank fraud in connection with his facilitation of down payment

arrangements for Dean Street.35 Ample evidence exists to

support the finding that Landman knew a down payment requirement

existed and that he knew about the various fraudulent methods

33 Ward was involved in running the newspaper advertisement that
originally attracted the buyers to the Dean Street project.
However, that act was not necessarily directed toward these
specific fraud counts and, while contributing to the fraud, was
not alone sufficient to constitute an affirmative act of
facilitation of the fraudulent loan transactions charged in
Counts 24 and 25.

34 We note that Hagopian, who was also convicted on these two
charges and whose conviction we are upholding, did actively
solicit the buyers, discuss down payment arrangements with them
(such as dischargeable mortgages), and provide rebate money after
their purchases.

35 The jury found Landman not guilty on two counts of bank
fraud.

-53-

used to avoid that requirement. As in Ward's case, however, the

evidence is not sufficient to show Landman participated in the

execution of a scheme to defraud for four out of the six bank

fraud counts.

Landman acted as an escrow agent for a number of the

condominium closings and one of his main responsibilities was

receiving down payments from buyers and transferring them to the

seller, Dean Street. Marderosian testified that he told Landman

that Gauvin and Granoff would be funding down payments for the

initial purchasers and Landman should hold that down payment

money. Landman knew that the down payment funds were being

returned to whoever provided them as Landman himself delivered

the money back to its source on several occasions.36

Landman also knew about the fraudulent second mortgages

that were supposed to cover part of the down payment. He knew

the buyers were signing meaningless promissory notes for second

mortgages at the closings because Marderosian told him beforehand

that the mortgages would be discharged. At the closings, several

buyers asked Landman when the mortgages would be released as

promised because the discharge letter accomplishing this was not

part of the closing documents (presumably so Bay Loan would not

36 Marderosian explained to Landman that Reisch would be wiring
money directly into buyers' accounts to pay for their down
payments and that buyers would then write checks to Landman.
Landman assured Reisch that he would look after the money. The
evidence indicates that with respect to at least some of the
transactions, Landman returned the down payment funds that Reisch
had provided back to Reisch, writing checks back to Reisch from
the money Reisch had originally given to the buyers.

-54-

see the letter). Landman made gestures to these buyers to

indicate that they should not talk to him about it.37 All

these facts, taken together, support the jury's conclusion that

Landman knew that something illegal was being done to get around

the down payment requirement.

We reject Landman's argument that there is insufficient

evidence to prove he knew Bay Loan was the target of the scheme

to defraud. To begin with, Brandon was "completely open" about

Bay Loan's involvement and told a number of people involved in

the scheme. Several buyers testified that they knew about Bay

Loan, including one person whose only involvement was his

purchase of a single unit. Landman shared office space with

Brandon's point man in the scheme, Marderosian, who was

intimately involved in all the details of the scheme. Finally,

the closing documents included a letter indicating Bay Loan was

the ultimate lender;38 Landman acted as escrow agent for many

37 At one closing, Kumalae "asked Owen if he wanted her to
address [the mortgage discharge] at the time," and Landman
responded that it "had nothing to do with him . . . he didn't
want to know anything about it." Another time "Mr. Landman did
not want to hear about it in front of us. I do recall him saying,
his hands saying not in front of me." Still another buyer
testified that Landman "gestured" when confronted with the
mortgage discharge issue. Landman argues that his responses and
gestures could mean he just did not know anything about it and
could not answer the buyers' inquiries. We find that a
reasonable jury could also conclude that Landman's actions
indicated he already knew that something illegal was going on and
was trying to disassociate himself from it.

38 As discussed in footnote 24, Homeowners furnished a letter
stating that they transferred their rights in the mortgage to Bay
Loan. A similar document was furnished for the transactions
brokered by East West. Although the same uncertainty regarding
the presence of the letter at the closings discussed in Granoff's

-55-

of the closings and also conducted a few of them himself.39

Sufficient evidence exists to support the jury's

verdict on the conspiracy count and on Counts 21 and 22. Counts

21 and 22 allege bank fraud in connection with the closings of

two units at the Hillside Motel. The evidence reveals that

Landman returned the down payment funds provided by Reisch in

connection with these transactions back to Reisch in violation of

the down payment requirement.40 In addition, one Dean Street

employee, Marie Lynch, testified that, in general, she would

bring buyers' certified down payment checks to Landman after

money was wired by Reisch to the buyers' accounts to accomplish

the certification. Lynch testified that she once saw Landman

write a check to Reisch for the amount of the down payment funds

she had just brought to him. Lynch did not specify which

transactions she was referring to in her testimony but the record

does contain checks written by Landman to Reisch for the exact

amount of the down payment funds wired by Reisch for the Hillside

case above also exists with respect to Landman, there is more
reason to believe Landman saw and read at least one of the
letters because Landman had greater exposure and familiarity with
the closing documents.

39 Marderosian testified that when he prepared Landman for the
closings which Landman conducted, he "explained what documents
[Marderosian] would be preparing and that [Landman] had to
oversee their execution at the closing."

40 That evidence consists of a check written by Landman to
Reisch for the exact amount of the funds which Reisch had wired
into the buyers' accounts for the purchases in Counts 21 and 22.
As discussed above, at the time Landman wrote the check, he had
already been told what Reisch was doing and had agreed to look
after Reisch's money.

-56-

purchases referred to in Counts 21 and 22.41 We therefore find

the evidence sufficient to support the convictions for bank fraud

charged in Counts 21 and 22. This evidence is also sufficient to

show willful participation in the conspiracy and thus supports

Landman's conviction on Count 1.42

Landman argues that his actions were just a normal and

proper function of his job as escrow agent. His

responsibilities, he claims, were strictly limited to receiving

and distributing money at Dean Street's direction. See United

States v. Bruun, 809 F.2d 397, 402-03, 410 (7th Cir. 1987). This

"just following orders" defense cannot stand in the face of the

evidence showing that Landman knew down payments were being

falsified, that he agreed to safeguard Reisch's down payment

funds, and that he personally falsified two down payments by

returning the funds to Reisch. The evidence was sufficient to

indicate that Landman's intent was to participate in transactions

41 Although the testimony that Landman "[c]ut a check to Norman"
Reisch referred to a transaction sometime in the fall of 1988,
roughly a month after the Hillside closings in Counts 21 and 22,
it does add some credence to the government's account of
Landman's involvement in the scheme to defraud.

42 Landman is wrong in claiming that the jury impermissibly
ascribed the illegal actions of Marderosian to Landman. Cf.

United States v. Crocker, 788 F.2d 802, 806 (1st Cir. 1986)

("[A]scribing criminal liability to [an alleged] conspirator for
a co-conspirator's acts by way of the adoption mechanism inherent
in a conspiracy requires that the imputed acts be in furtherance
of the conspiracy or that they fall within its reasonably
foreseeable scope."). Returning down payment funds that are
required by the bank is not only within the foreseeable scope of
the conspiracy but directly in furtherance of it. The government
thus established Landman's criminal conduct independently from
that of Marderosian.

-57-

designed to deceive Bay Loan.

With respect to Counts 23 through 26, relating to

closings at the Sandcastle Motel, no checks written by, or to,

Landman that involved down payment funds were in evidence. The

government stipulated that the relevant checks for these

transactions were forgeries. In particular, Landman's signature

on the checks for the Sandcastle transactions were forged by

Marderosian.43 It is true that Landman conducted the closings

for the Sandcastle units and thus in some sense facilitated the

scheme to defraud,44 but that alone is not sufficient to show

that Landman participated in the relevant act of fraudulently

violating the down payment requirement for those individual

transactions. On the contrary, it seems that Landman never saw

the down payment checks as the money did not go through his

escrow account. Instead, the checks were transferred directly to

Reisch.

43 The existence of forgeries does not, as Landman claims,
provide conclusive proof of his innocence on all the counts.
Just because his name was forged on some of the checks does not
necessarily imply that Landman did not know of, or agree to go
along with, the conspiracy. In other words, it is not true that
the forgeries could only indicate that Marderosian was forced to
go behind Landman's back to accomplish the scheme to defraud.
For one, Marderosian testified that Landman authorized some of
the forgeries and indicated that forging Landman's name was a
method of convenience rather than a way to hide illicit activity
from Landman. More importantly, Landman did write checks for
illegal transactions in Counts 21 and 22, which, in conjunction
with the other proof of Landman's knowledge and intent, is
sufficient to uphold the conspiracy charge.

44 Lynch's testimony that Landman wrote a check to Reisch for
the Sandcastle units is decisively contradicted by the
government's stipulation that the checks were forgeries.

-58-

We note that Landman also conducted closings for units

at the Atlantic Inn-Narragansett, but the jury acquitted Landman

on the charges connected to those transactions (Counts 16 and 17)

apparently because it found the act of conducting the closings

was, by itself, insufficient to establish the execution of a

scheme to defraud. For Counts 23 through 26, once the stipulated

forgeries are removed from consideration, there is similarly

little evidence to support a conviction beyond the fact that

Landman conducted the closings. While the jury is not held to

consistent results, we think that the acquittal on Counts 16 and

17 reinforces our judgment that (absent some confusion about the

forged checks),45 there was insufficient evidence to convict on

Counts 23 through 26. Because the evidence is insufficient to

prove that Landman executed or aided in the execution of the

schemes to defraud Bay Loan charged in Counts 23 through 26, we

reverse his conviction on those counts.

7. Momi Kumalae

Kumalae was convicted of conspiracy and three counts of

bank fraud in connection with various actions she took while

45 There was apparently some confusion surrounding the exhibits
containing the forged checks. The government agreed to use the
checks only against the other defendants, namely Reisch, but
argued during closing argument that Landman was responsible for
the checks written to Reisch on the Sandcastle units. The
government did not explicitly state that Landman signed the
forged checks; however, it failed to acknowledge the stipulation
of forgeries and seemed to imply no forgeries existed. In any
event, we are convinced that the jury improperly considered the
forged checks in their guilty finding on Counts 23 through 26.

-59-

working as an assistant to Brandon at Dean Street.46 The

evidence establishing Kumalae's knowledge of Bay Loan's down

payment requirement and the scheme to fraudulently violate it is

the following: (1) Brandon testified that he told Kumalae about

his relationship with Bay Loan, (2) an East West employee

testified that she asked Kumalae to forward information about the

unit buyers so that she could satisfy the guidelines established

by Bay Loan; (3) Kumalae was present during some of the

conversations between Brandon, Ward, Hagopian and a buyer in

which down payments were discussed; (4) Kumalae was also present

at a meeting at which Brandon said "they needed to show down

payments or something so they were going to wire money into the

accounts or deposit it and they needed one of our checks to prove

that it came out of our account"; (5) Kumalae told one buyer that

she needed a check from him and that she would be "doing the

transactions at the banks"; (6) Kumalae assured one buyer whose

down payment check had not been negotiated that his check had not

been used; and, (7) Kumalae instructed another Dean Street

employee, Marie Lynch, who had asked about the discharges of the

second mortgages that "there weren't supposed to be any second

mortgages and to just don't worry about it. They were being

taken care of."

The evidence that she willfully participated in this

scheme is as follows: (1) Kumalae advised buyers of how their

46 The jury found Kumalae not guilty on one count of bank fraud.

-60-

down payment requirement would be satisfied;47 (2) she once

wired money from her own account to a buyer in order to fund his

down payment;48 (3) she signed several of the mortgage

discharge letters provided to the buyers;49 and, (4) she

received some of the down payment checks, and because several of

these checks were deposited directly into Reisch's account,

presumably by Kumalae, she effected the return of down payment

funds to their source in violation of the down payment

requirement. All of this evidence is sufficient to support

Kumalae's bank fraud and conspiracy convictions.

Kumalae attempts to rely on cases holding that a

defendant's mere presence at the scene of the crime or mere

association with criminals to whom all the evidence at trial

pertains is insufficient to support a conviction for conspiracy.

United States v. Ocampo, 964 F.2d 80 (1st Cir. 1992); United

States v. Mehtala, 578 F.2d 6, 10 (1st Cir. 1978); United States

v. Joiner, 429 F.2d 489, 493 (5th Cir. 1970). Kumalae's reliance

on these cases is misplaced because the government's case rested

47 Kumalae told one buyer "no down payments" were required and
that Brandon was a "stand-up guy" who would "take care of things
and not to worry." On another occasion she told a buyer that his
mortgage discharge "would be taken care of after the closing."

48 This was the basis for the transaction for Count 15 and is
sufficient to support her conviction on that count.

49 One buyer testifies that he picked up his discharge letter
and the letter of another buyer directly from Kumalae. These
discharges were made for the transactions in Counts 24 and 25.
We note that the jury acquitted Kumalae on Count 23 presumably
because there was no such testimony to support Kumalae's
involvement with the discharge.

-61-

on Kumalae's own knowledge of the scheme to defraud based on her

own statements to others and on a series of actions taken by

Kumalae herself that directly defrauded Bay Loan. Kumalae's

argument that she was just acting in good faith by performing

ministerial duties for Dean Street and nothing more also fails.

The record is clear that Kumalae wired down payment funds to

buyers from her own account and signed mortgage discharge

letters. These actions were not merely "ministerial duties."

V. SEVERANCE

The district court denied the motions for severance50

made by several of the defendants51 who argued that they were

unfairly prejudiced by the evidentiary spillover from the case

presented against their more culpable co-defendants. The

defendants' claim is that the joint trial seriously limited the

jury's ability to sift through all the evidence against each

individual defendant and increased the risk that the jury would

base its verdicts on evidence which has no bearing on the guilt

or innocence of defendants with a more limited involvement in the

50 The rule authorizing motions for severance states in
pertinent part:

If it appears that a defendant . . . is
prejudiced by a joinder . . . of
defendants . . . for trial together, the
court may . . . grant a severance of
defendants or provide whatever other
relief justice requires.

Fed. R. Crim. P. 14.

51 Granoff, Gauvin, Hagopian, Reisch, Kumalae, and Ward all
moved for severance before and during trial and all raise the
issue on appeal.

-62-

scheme. Whatever the advisability, in general, of holding mass

trials in complicated cases with many defendants of varying

culpabilities, we do not find any significant degree of

unfairness or prejudice in this case that would warrant a

reversal of the district court's refusal to sever the trial.

The decision to grant or deny a motion for severance is

committed to the sound discretion of the trial court and we will

reverse its refusal to sever only upon a finding of manifest

abuse of discretion. United States v. Olivo-Infante, 938 F.2d

1406, 1409 (1st Cir. 1991); United States v. Natanel, 938 F.2d

302, 308 (1st Cir. 1991), cert. denied, 112 S. Ct. 986 (1992);

United States v. Boylan, 898 F.2d 230, 246 (1st Cir.), cert.

denied, 498 U.S. 849 (1990); see also United States v. Searing,

984 F.2d 960, 965 (8th Cir. 1993) ("In the context of conspiracy,

severance will rarely, if ever, be required."). Defendants

seeking a separate trial must make a strong showing of evident

prejudice. United States v. O'Bryant, No. 91-2132, slip op. at 8

(1st Cir. June 29, 1993); United States v. Mart nez, 922 F.2d

914, 922 (1st Cir. 1991). This showing must demonstrate that the

joint trial prevented the jury from separating the evidence

against each defendant and reaching a reliable verdict. Zafiro

v. United States, 113 S. Ct. 933, 938 (1993); O'Bryant, No. 91-

2132, slip. op. at 8-9.

There is no indication in this case that the jury was

unable to distinguish the various charges and defendants or to

sort properly through the evidence relating to each defendant.

-63-

The jury demonstrated its ability to independently assess the

evidence when it acquitted four of the defendants on individual

bank fraud counts, see United States v. Figueroa, 976 F.2d 1446,

1452 (1st Cir. 1992), cert. denied, 113 S. Ct. 1346 (1993)

(finding acquittals to be a relevant factor in upholding a denial

of severance); United States v. Dworken, 855 F.2d 12, 29 (1st

Cir. 1988) (same), and when it asked that specific portions of

the transcript relating to specific defendants be read to them.

In addition, the trial judge provided a number of limiting

instructions throughout the trial that alleviated any potential

prejudice. See Figueroa, 976 F.2d at 1452; United States v.

Tejeda, 974 F.2d 210, 219 (1st Cir. 1992).

The degree of prejudicial spillover appears minimal as

no defendant has demonstrated which, if any, evidence presented

at trial would have been inadmissible if presented against that

defendant at a separate trial. The government presented

sufficient evidence to show that all defendants were involved in

a single interdependent conspiracy, see Section IX.B., and most

of the evidence at trial was related to the development and

operation of that conspiracy. "Where evidence featuring one

defendant is independently admissible against a codefendant, the

latter cannot convincingly complain of an improper spillover

effect." O'Bryant, No. 91-2132, slip op. at 10 (collecting

cases). Moreover, "[e]ven where large amounts of testimony are

irrelevant to one defendant, or where one defendant's involvement

in an overall agreement is far less than the involvement of

-64-

others, we have been reluctant to secondguess severance denials."

Boylan, 898 F.2d at 246 (citations omitted). We therefore affirm

the judge's decision to deny the severance motions.

VI. PRETRIAL PUBLICITY
VI. PRETRIAL PUBLICITY

On January 1, 1990, the Governor of Rhode Island

ordered the closure of credit unions in that state insured by a

private entity known as the Rhode Island Savings Deposit

Insurance Corporation (RISDIC). After years of risky real estate

investments, many credit unions were unable to weather the late

1980s crash in the real estate market and RISDIC could not cover

their anticipated losses. In the process of closing the credit

unions, the governor froze the assets of hundreds of thousands of

angry depositors. The ensuing panic among depositors as well as

the public hearings, criminal investigations, and civil lawsuits

received extensive media coverage. The Rhode Island credit union

crisis, although coexistent with Dean Street's downfall, is not

related to the present case.

Defendants raised a series of claims related to the

district court's alleged failure to shield them from the

prejudicial effects of publicity surrounding the Rhode Island

credit union crisis. They argue that their right to an impartial

jury was jeopardized by the trial court's denial of their change

of venue motion, their request for individual voir dire, their

request to question the jurors about losing money in the credit

union crisis, and their request for a mistrial or curative

instructions after the admission of certain evidence relating to

-65-

the failed credit unions. As we find no significant threat to

the trial's fairness from the effects of unfavorable publicity,

we uphold the district court's denial of the motions related to

prejudicial publicity.

A. Change of Venue

The decision to grant a change of venue52 is within

the sound discretion of the trial court and is reviewed for abuse

of discretion. United States v. Rodr guez-Cardona, 924 F.2d

1148, 1158 (1st Cir.), cert. denied, 112 S. Ct. 54 (1991); United

States v. Angiulo, 897 F.2d 1169, 1181 (1st Cir.), cert. denied,

498 U.S. 845 (1990). Change of venue is proper where the level

of prejudice against a defendant precludes a fair and impartial

trial because the community is saturated with inflammatory

publicity about the case. Rodr guez-Cardona, 924 F.2d at 1158;

Angiulo, 897 F.2d at 1181; United States v. Moreno Morales, 815

F.2d 725, 731 (1st Cir.), cert. denied, 484 U.S. 966 (1987).

Defendants proffered forty-four newspaper articles

relating to Dean Street and their criminal case, as well as other

examples from the media which purported to show negative feelings

stemming from the credit union crisis against those who benefited

52 The trial court, upon a defendant's motion, will transfer the
trial to another district

if the court is satisfied that there
exists in the district where the
prosecution is pending so great a
prejudice against the defendant that the
defendant cannot obtain a fair and
impartial trial.

Fed. R. Crim. P. 21(a).

-66-

from failed financial institutions. Defendants claim that this

demonstrated widespread prejudice among potential jurors against

them. They argue that the jurors would not distinguish Bay Loan

from the failed credit unions and consequently the jurors would

direct their hostility toward those involved in the credit union

crisis against the defendants at trial.

We find that the publicity relating to this case did

not particularly saturate the community with inflammatory

sentiment nor do we have any reason to believe that the jury was

anything but impartial. The articles presented by the defendants

evidence standard factual press coverage of a criminal case and

are neither inflammatory nor sensational. See Angiulo, 897 F.2d

at 1181 (stating that prejudice will not be presumed in the case

of merely factual reporting, instead "the publicity must be both

extensive and sensational in nature"). Only five of the forty-

seven prospective jurors had ever read or heard about the case

and none of them sat on the jury. We find nothing in the record

to indicate that the jurors' feelings about the credit crisis, if

they had any, impaired their impartiality in the present case.

The trial judge appropriately cautioned the jury about the need

to separate the credit crisis from this case and, as discussed

below, he conducted a voir dire that sufficiently investigated

possible bias. The trial judge determined that the jurors would

understand that the credit crisis had no connection to this case

when he denied the change of venue motion and we find no abuse of

-67-

discretion in this conclusion.53

B. Voir Dire

Defendants argue that the denial of their request for

individual voir dire and their request for jurors to be asked

whether they had lost money in the credit unions jeopardized

their right to an impartial jury. See Irvin v. Dowd, 366 U.S.

717, 722 (1961). Defendants claim that as a result of these

rulings the court did not adequately investigate possible bias

against defendants stemming from the credit union crisis. See,

e.g., United States v. Gillis, 942 F.2d 707 (10th Cir. 1991).

The trial court has broad discretion in conducting voir

dire. United States v. McCarthy, 961 F.2d 972, 976 (1st Cir.

1992); Real v. Hogan, 828 F.2d 58, 62 (1st Cir. 1987). "It is

more than enough if the court covers the substance of the

appropriate areas of concern by framing its own questions in its

own words." Hogan, 828 F.2d at 62 (citations omitted). In this

case, the judge adequately probed prospective jurors for possible

bias related to the credit union crisis54 and specifically

53 We also reject the allegation of actual juror prejudice based
on the unsubstantiated claim that there was a chance that actual

prejudice existed which could have been revealed if the judge
asked the right questions during voir dire. As we find no errors
in the voir dire process, see subsection B, and no other

indication of actual prejudice, we find this allegation
unfounded.

54 Specifically the judge told prospective jurors:

One thing I should caution you about is
some of you may be aware that there has
been some publicity in Rhode Island
recently about the credit unions and the
difficulties that they've experienced,

-68-

inquired several times whether any of the jurors or their

families had "lost money in a bank fraud or anything of that

sort." One juror responded affirmatively to the court's

questions in this area and was excused.55 Throughout the voir

dire, any juror responding to the court's queries was subjected

to individual questioning by the judge and by counsel. For these

reasons, we find no errors in the voir dire process.

C. Prejudicial Evidence

During the trial, the judge admitted evidence relating

to some of the failed credit unions and individuals involved in

the credit union crisis. Specifically, during the government's

direct examination of Marderosian in which he was questioned

about the use of Bay Loan funds obtained from the Sandcastle

closings, Marderosian explained that, in accordance with

Brandon's instructions, he had deliberately failed to pay a

preexisting $1.5 million mortgage held by the Rhode Island

and I want to be sure that everyone
understands that this case is not in any
way related to those events. Is there
anybody who thinks they would have
difficulty in separating this case from
anything you might have heard about the
problems credit unions in Rhode Island
have experienced?

55 Defendants make an additional argument that because jurors
were told that the credit crisis had no relation to this case,
they did not think losing money in credit unions was important
before the trial started and thus would not have responded to the
judge's comments during voir dire. Yet, once evidence linking
defendants to the credit crisis was presented at trial, see

subsection C, the issue of losing money became critical and the
risk of bias was no longer adequately addressed by the voir dire.
The creativity of this argument is matched only by its
improbability and speculative nature. We summarily reject it.

-69-

Central Credit Union. Instead, he used the loan proceeds to pay

off other Dean Street creditors. Included in the lengthy list of

these creditors admitted at trial were Robert Barbato, Atrium

Financial, and Davisville Credit Union. All of these entities

and individuals were involved in the RISDIC credit union

crisis.56 Defendants objected to the evidence and moved for a

mistrial arguing that the evidence was irrelevant and highly

inflammatory.

The decision to admit or exclude evidence under Fed. R.

Evid. 40357 is committed to the broad discretion of the trial

court and we will reverse the court's judgment only rarely and in

extraordinary compelling circumstances. United States v.

Nickens, 955 F.2d 112, 125 (1st Cir.), cert. denied, 113 S. Ct.

108 (1992); United States v. McMahon, 938 F.2d 1501, 1507 (1st

Cir. 1991). Rule 403 requires a balancing of the probative value

of a piece of evidence against its prejudicial effect. United

States v. Rodr guez Cort s, 949 F.2d 532, 540 (1st Cir. 1991).

56 Rhode Island Central Credit Union and the Davisville Credit
Union were among the institutions closed as a result of RISDIC's
failure. (Davisville apparently failed despite Dean Street's
preferred payment on its debt with them). Robert Barbato, who
purportedly was connected to organized crime, was a heavy
borrower of the credit unions. Atrium Financial was owned in
part by one of the key figures in the credit union crisis.

57 Rule 403 provides in part:

Although relevant, evidence may be
excluded if its probative value is
substantially outweighed by the danger of
unfair prejudice . . . .

Fed. R. Evid. 403.

-70-

Exclusion is proper only when the probative value is

"substantially outweighed" by the risk of prejudice. McMahon,

938 F.2d at 1508.

The admitted evidence was relevant to the issue of

whether Marderosian was stealing the loan proceeds for Bay Loan

or passing them on as Brandon directed. Marderosian, the

government's key witness, was attacked by the defense and the

media as the main culprit in the scheme and the government sought

to bolster the credibility of his testimony by showing that

Marderosian did not improperly divert any of the large sums of

money that he handled into his own pocket. The evidence also

helped provide a foundation for later expert testimony regarding

what happened to the funds obtained from Bay Loan in the course

of the scheme to defraud.

The relevancy of the evidence sufficiently outweighed

the minimal prejudicial effect that was created by the brief

mention of individuals and entities that were connected to the

credit union crisis. First of all, nothing at trial linked the

named individuals and entities to RISDIC or the credit union

crisis. In order to find prejudice, the court would have had to

infer that the jury had heard of the individuals and entities

from an external source and also knew of their involvement in the

credit union scandal.58 Even if the jurors did know of the

involvement of the named individuals and entities, it is

58 The judge offered to question the jurors about their possible
knowledge of the persons named in the disputed testimony but
defense counsel refused.

-71-

doubtful, given the court's various cautioning instructions and

the voir dire process, that jurors would likely be biased against

defendants just because certain names were mentioned at trial.

At most, the jurors might conclude that defendants contributed to

the failure of at least one credit union by not repaying certain

loans. The trial judge asked the jurors, however, if they had

lost any money from bank fraud related schemes and no sitting

jurors said they had. Thus we have no reason to believe that any

juror who may have inferred that defendants contributed to the

credit union crisis would be particularly likely to find

defendants guilty without fairly considering the evidence.

Finally, to the extent that the balancing of relevance and

prejudice was a close call, we find no abuse of discretion and

uphold the trial court's admission of the disputed evidence.

VII. EXCLUSION OF EVIDENCE

During the trial, defendants attempted to proffer

evidence regarding the allegedly common practice by financial

institutions of requiring no down payment on the sale of

commercial real estate. On cross-examination of several

government witnesses, Hagopian's attorney asked whether it was

customary during the relevant time period to buy and sell

commercial properties with no money down and to obtain 100%

financing. The government objected on relevancy grounds and the

district court sustained the objections. On another occasion,

Brandon presented an expert witness, James White, to bolster the

credibility of certain testimony. Brandon had testified that Bay

-72-

Loan Vice President Gormley acknowledged that the proposed end

loans to unit buyers actually constituted one single commercial

loan to Dean Street, even though they were to be submitted

individually as consumer residential loans. Brandon sought to

present Mr. White's opinion that the loans at issue were more

consistent with commercial rather than consumer loans. The

district court again excluded the testimony on relevancy grounds.

We affirm the trial court's rulings.59

In general, "[a]ll relevant evidence is admissible" and

"[e]vidence which is not relevant is not admissible." Fed. R.

Evid. 402. The district court has broad discretion in making

relevancy determinations and we must review its decisions only

for abuse of that discretion. United States v. Griffin, 818 F.2d

97, 101 (1st Cir.), cert. denied, 484 US 844 (1987); United

States v. Lamberty, 778 F.2d 59, 61 (1st Cir. 1985). Evidence is

relevant if it has "any tendency to make the existence of any

fact that is of consequence to the determination of the action

more probable or less probable than it would be without the

evidence." Fed. R. Evid. 401; Lamberty, 778 F.2d at 61.

Defendants argue that the excluded evidence is relevant

to one of their theories of the case: (1) either that Bay Loan

knew of and approved their falsification of down payments; or (2)

that defendants did not know about, or intend to violate, Bay

Loan's down payment requirement. The proffered evidence,

59 Because we find the disputed evidence was not relevant to
defendant's case, we also reject Brandon's argument that the
trial court impaired his right to present his theory of defense.

-73-

however, does not make either of these theories any more likely

to be true and thus the evidence is irrelevant.

As for the first theory, Brandon tried to show at trial

that Bay Loan aggressively purchased non-conforming loans, that

he openly sought 100% financing from the bank, and that Bay Loan

agreed to provide the financing without down payments by

directing Dean Street to falsify the paperwork to show the

existence of down payments. The expert testimony and the

government witness's testimony about the common practice of no

down payment financing may add support to the first two

assertions, but those assertions are simply not at issue in this

case. Rather, Bay Loan's alleged approval of false down payments

is at issue. The defendants, however, have not demonstrated any

relationship between the proffered evidence that no down payment

financing was a common practice and the likelihood that Bay Loan

directed Dean Street to falsify paperwork to misrepresent the

existence of down payments that were never made.

The problem with defendants' argument is that no

connection between the common use of 100% financing and the use

of false down payments was ever established.60 That is, for

60 The same problem exists regarding the connection between the
fake down payments and the expert's distinction between
residential and commercial loans. Brandon sought to characterize
the mortgages from Bay Loan as more like commercial than consumer
loans and thus subject to different standards and policies.
Specifically, he sought to show that 100% financing was normal
for commercial loans and to counter the allegedly critical
contention that residential loans typically require down
payments. This is basically the same type of evidence as the
testimony that 100% financing was customary in the industry.
That is, a showing that Bay Loan's mortgages were commercial

-74-

the evidence to be relevant, there must be some reason to believe

that 100% financing, or no down payment financing, is customarily

provided in conjunction with paperwork showing fake down

payments. A no down payment custom does not establish a fake

down payment custom. The defendants lack, therefore, any

foundation that would make the proffered evidence relevant.

"'Trial judges have wide discretion in deciding whether

an adequate foundation has been laid for the admission of

evidence.'" Veranda Beach Club Ltd. Partnership v. Western

Surety Co., 936 F.2d 1364, 1371 (1st Cir. 1991) (citing Real v

Hogan, 828 F.2d 58, 64 (1st Cir. 1987)); see also United States

v. Young, 804 F.2d 116, 119 (8th Cir. 1986), cert. denied, 482

U.S. 913 (1987). No foundation was laid in this case. Even if

we accept 100% financing was in fact generally common in the

industry and for Bay Loan, it does not follow that Bay Loan's

approval of false down payment transactions is any more likely.

Defendants must provide, for example, some evidence that the

recording of down payments in no down payment transactions was a

common formality, perhaps for accounting, tax or bookkeeping

helps to establish the likelihood that the loans were actually
"no down payment loans." This still leaves us without the
missing foundational link -- that no down payment financing is
somehow associated with falsified down payments.

In response to Brandon's claim that the government proved its
case by showing the transactions deviated from the norm, we note
that the relevant norm is not 100% versus 80% financing but the
standard method of representing down payments, or lack thereof,
in loan transactions. Proof of a no down payment norm does not
establish a fake down payment norm.

-75-

purposes,61 or for the convenience of some interested party.

If such evidence existed, then maybe a sufficient foundation

would exist for the relevance of 100% financing. However, no

such foundation is evident in the record.

What defendants were really trying to show is that the

bank or its officials were themselves perpetrating some sort of

fraud and the defendants were unwittingly caught up in it. This

assertion, however, also lacks foundational support. The

defendants want the proffered evidence to establish that Bay Loan

was in the practice of providing 100% financing and thus likely

to be providing 100% financing in this case as well, regardless

of whether such financing involved fake down payments, kickbacks

or fraudulent paperwork. This formulation, however, obscures the

real issue: if Bay Loan intended to provide 100% financing, or if

defendants thought down payments were waived, why did they have

to take actions to falsify down payments? To satisfy this

requisite foundational question, the defendants had to show

either that, (1) officials at Bay Loan stood to reap some

personal gain by offering loans with no down payments in

violation of the bank's requirements and thus needed to falsify

61 Brandon claims that Bay Loan directed him to falsify down
payments so that the bank could package the commercial loans as
residential loans. Were his claim true, however, it would not
make the common practice of providing commercial loans, and the
100% financing such loans allegedly involve, any more relevant to
the issue of why the falsification of down payments is
justifiable. Still lacking is some indication that the common
practice of lending money without down payments makes it more
likely that the bank would find it necessary to mischaracterize
loans and consequently direct Dean Street to produce false down
payment paperwork.

-76-

down payments to hide the violation from bank superiors; or (2)

the bank as a whole stood to reap some gain by lending money

under false pretenses, perhaps to deceive their creditors,

shareholders, or regulators.62 In the absence of some evidence

supporting these two propositions, the custom of 100% financing

or the characterization of the loans as commercial as opposed to

residential does not make Bay Loan's approval of fraudulent down

payments any more likely to be true. Again, the foundational

link is simply missing.

The excluded evidence is similarly irrelevant to

defendants' lack of knowledge or intent to defraud Bay Loan.

Defendants claim that evidence that 100% financing was a standard

practice supports their claim that they did not know or suspect

anything was unusual or illegal about the loan transactions they

participated in. Again, what is at issue is the existence of

falsified down payments. There is no basis for finding that

defendants were more likely to think that their actions to

facilitate the documentation of nonexistent down payments were

somehow legitimate just because 100% financing was customary. To

put it another way, the proffered evidence does not make the

false down payment maneuvers less likely to tip off the

defendants to the illegal nature of the transaction without some

foundation connecting 100% financing to creative down payment

62 Defendants presented evidence that Bay Loan was knowingly
lending in violation of other requirements it imposed, not the
least of which was the requirement that buyers live in the
condominiums they purchased which was impossible given the units
were to be operated as motels.

-77-

paperwork of some kind. Defendants were not engaged in what

appeared to them to be a "no down payment transaction"; they were

doing what appeared to them to be a transaction where a paper

down payment was documented and recorded but not actually paid.

The no down payment custom would only be relevant to intent if

that custom involved something even vaguely similar to this sort

of paper down payment. Because no such foundation exists on the

record, and because we find no abuse of discretion on the part of

the trial court in refusing to allow the jury to assume or infer

that foundation, we uphold the exclusion of the proffered

evidence.63

VIII. PREJUDICE FROM COMMENTS REGARDING DEFENDANTS' ETHNICITY

During the fifth day of trial, the government's main

witness, Marderosian, testified about a comment made by defendant

Landman concerning the religious affinity between Landman and co-

defendant Reisch. Marderosian was describing on direct

examination the arrangement for Reisch to wire down payment money

into buyers' accounts. The arrangement was designed, in part, to

allay Reisch's concern that too much money would be outstanding

between the time he provided funds to the buyers and the time the

funds were returned to him by Dean Street. In reference to a

63 Unlike the cases cited by defendant that have held that a
certain custom or practice in an industry may be relevant to the
defendant's case, United States v. Aversa, 984 F.2d 493 (1st Cir.

1993) (en banc); United States v. Seelig, 622 F.2d 207 (6th

Cir.), cert. denied, 449 U.S. 869 (1980); United States v. Riley,

550 F.2d 233 (5th Cir. 1977), the proffered custom in this case
is unrelated to the alleged illegal activity.

-78-

discussion between Marderosian and Landman,64 the government

asked: "What, if anything did Mr. Landman say to you about

concerns expressed by Mr. Reisch?" Marderosian responded:

Mr. Landman stated to me on one occasion,
I am not sure if it was that occasion,
that Mr. Reisch appeared comfortable
doing it this way and part of the reason
for that, Mr. Landman explained, was that
Mr. Landman was involved and he was
Jewish and Mr. Reisch was Jewish and that
the level of comfort shouldn't be
underestimated by me.

Defendants did not immediately object to this statement

after it was made; however, Reisch's attorney moved to dismiss

later that same day. The judge denied the motion and also denied

later defense motions for a mistrial. Defendants argue that the

testimony invited the jury to make the impermissible inference

that members of the same religion would be more likely to trust

each other and join in a conspiracy and also that the testimony

may have provoked anti-Semitic feelings among jurors. When

defendants first raised their objections, the trial judge asked

counsel what they wanted him to do and the judge offered to try

and ferret out any possible anti-Semitism on the jury. Counsel's

only request was for dismissal. Counsel did not request further

questioning of the jury on this matter and expressed displeasure

64 Marderosian's testimony about Landman's statement properly
falls under the co-conspirator exception to the hearsay rule,
Fed. R. Evid. 801(d)(2)(E), because the evidence clearly
establishes beyond a preponderance of the evidence that
Marderosian, Landman and Reisch were all members of the
conspiracy and the statement was made during the course of and in
furtherance of the conspiracy. See United States v. Angiulo, 897

F.2d 1169, 1201-02 (1st Cir.), cert. denied, 498 U.S. 845 (1990).

-79-

with the possibility of providing curative instructions because

"instructions would only magnify the problem."

Under these circumstances, we do not think that the

trial court's actions constitute reversible error despite the

possible inappropriateness of the testimony. The level of

prejudice, if any, was not sufficiently significant to overturn

the judge's decision to accept the defendants' tactical choice to

forgo more appropriate methods of addressing the potential

prejudice in favor of the unrealistic and unnecessary solution of

a dismissal or a new trial. Cf. United States v. De La Cruz, 902

F.2d 121, 124 (1st Cir. 1990) (noting the reluctance of this

court to require trial judges to override plausible strategic

choices on the part of counsel in the context of remedying

potential prejudice); United States v. Goldman, 563 F.2d 501, 505

(1st Cir. 1977), cert. denied, 434 U.S. 1067 (1978) (refusing to

reverse verdict in trial with prejudicial references to religion

because the trial judge gave curative instructions).

The prejudicial effect of Marderosian's statement

appears quite limited. The reference to defendants' Judaism was

the only such mention of religion at trial. It amounted to one

brief sentence in nineteen days of testimony and argument. There

was no subsequent reference to the challenged testimony nor did

the government use the issue of religious affinity in its closing

argument. The inference of Jewish affinity was not, as defendant

Landman claims, central to the government's case. The basis of

Landman's agreement to participate in the conspiracy was not his

-80-

promise to protect the interests of Reisch but his agreement with

Marderosian and Brandon to facilitate the unit sales without down

payments. As discussed above, see Section IV.B.6, the record

contains sufficient facts regarding Landman's actions and

statements made by, and to, him to support his knowledge and

participation in the conspiracy. None of these facts have

anything to do with Landman's supposed religious affinity with

Reisch.65 Likewise, the evidence against Reisch centers around

his agreement with Brandon to provide money to the scheme and not

around his relationship with Landman. In fact, Landman was

acquitted by the jury on two bank fraud counts that involved the

funding of down payments by Reisch in which Landman conducted the

closings. This indicates that the jury was not prejudiced and did

not rely on the disputed testimony in its verdict.

Nothing like the serious prejudicial circumstances

found in United States v. Rodr guez Cort s, 949 F.2d 532 (1st

Cir. 1991) (finding reversible error from ethnically prejudicial

evidence), exists in this case. In Rodr guez Cort s, the

district court had found a defendant's Colombian identification

card admissible based on the impermissible assumption that

Colombians were more willing to trust fellow Colombians than

anyone else, and therefore, defendant was likely to be involved

65 There is also sufficient testimony, quite apart from the
disputed comment, that Landman agreed to look after Reisch's
interests. Marderosian testified that Reisch told Landman that
"he wanted Mr. Landman to look out for his interest to protect
his money to the extent possible." Landman later told
Marderosian "he would try to protect Mr. Reisch to the extent
possible."

-81-

with his Colombian co-defendants. Id. at 540. This connection

was emphasized in the government's closing argument. Id. at 541.

Here, there was no objection to the relevancy of Marderosian's

statement and thus no ruling based on an impermissible inference.

The judge recognized the potential for prejudice and offered to

take steps to rectify the problem. More importantly, the

government did not invoke any inferences based on religious

affinity in its final argument before the jury. Similarly,

United States v. Cruz, 981 F.2d 659 (2d Cir. 1992), and United

States v. Doe, 903 F.2d 16 (D.C. Cir. 1990), are distinguishable

from the present case because those cases involved the

government's explicit use of the impermissible reasoning, upon

extensive direct examination and on summation, for crucial parts

of its theory of the case.

Defendants suggest there was an element of

prosecutorial misconduct in eliciting the disputed testimony from

Marderosian. Marderosian had made a similar statement about

defendants' Judaism when he testified before the grand jury and

the pattern of questioning prior to Marderosian's statement at

trial could be construed as an attempt to elicit the same

testimony from him a second time. At the bench conference with

the judge, the prosecutor denied knowing beforehand that

Marderosian would make the comment about defendants' religion and

claimed to have instructed Marderosian to limit his testimony to

the fact that Landman said Reisch felt comfortable with the

arrangement. While the circumstances are somewhat troubling, we

-82-

do not find sufficient evidence of prosecutorial misconduct to

reverse the verdicts in this case, especially in light of the

absence of any reference to the religious comment in the

government's summation. Compare Goldman 563 F.2d at 504-05

(prosecutor, on summation, referred to fact defendant was wearing

"what they call in the Jewish religion a yamaka [sic]" and that

the symbol he was wearing "has been defamed, defiled and

scandalized").

IX. JURY INSTRUCTIONS

Defendants make three challenges to the jury

instructions in this case.66 They allege that the trial judge

failed to provide proffered instructions concerning the required

proof of intent for conspiracy and the possibility of multiple

conspiracies. They also argue that it was error for the judge to

give an instruction concerning willful blindness.

66 Defendant Granoff makes an additional argument that the trial
judge erroneously failed to instruct the jury that they must find
that defendants knew of Bay Loan's federally insured status and
that defendants knew Bay Loan was the target of the scheme to
defraud. Because we found that neither of these elements were
required for a conviction under the bank fraud statute, see supra

Section IV, the trial court did not err in refusing to give the
proffered instructions.

The trial judge was thus correct in instructing the jury that:

it is not necessary for the Government to
prove that the Defendant knew the
identity of the particular financial
institution or that the Defendant knew
that that institution was Federally
chartered or insured. . . . It must,
however, prove that the Defendant
intended to defraud a financial
institution.

-83-

A. The Direct Sales Conspiracy Instruction

The defendants proffered a jury instruction67 based

on the rule derived from Direct Sales Co. v. United States, 319

U.S. 703, 711, 713 (1943), that one who supplies goods to another

knowing that the recipient will use them for an illegal purpose

cannot, on that basis alone, be found guilty of conspiring with

the recipient. Rather, for the supplier to be culpable, he or

she must have the intent to further, promote, and cooperate in

that illegal purpose. Id.; United States v. Falcone, 109 F.2d

579, 581 (2d Cir.), aff'd., 311 U.S. 205 (1940). The district

court did not give the defendants' proffered instruction but

instead instructed the jury that "to be a member of a conspiracy,

a Defendant must have willfully joined it or participated in it

67 The instruction stated, in pertinent part:

You are instructed that a person who may
have furnished goods, money or services
to another person who he knows is or will
be engaged in criminal activity . . .
does not by furnishing such goods, money
or services necessarily become a member
of the conspiracy. Instead, . . . the
government must show beyond a reasonable
doubt that the defendant was aware of the
conspiracy and knowingly and voluntarily
joined it with the intent of furthering
its illegal aims.

To reiterate, it is not enough that the
Government prove that a particular
defendant acted in a way that furthered
the purposes or objectives of the
conspiracy. Instead the Government must
prove beyond a reasonable doubt that the
defendant acted while knowing of the
unlawful agreement and with the intention
to participate in it.

-84-

for the purpose of advancing or furthering its unlawful

purposes." The court also stated that the government must prove

each defendant's "intent to participate in the unlawful scheme."

Defendants argue that this instruction inadequately addressed the

intent requirement laid out in Direct Sales and Falcone.

The trial court's failure to give a proffered

instruction will not be reversed unless that instruction is (1)

substantively correct; (2) was not substantially covered in the

charge actually given; and (3) concerned an important point such

that the failure to give it seriously undermined the defendant's

ability to present a particular defense. United States v.

McGill, 953 F.2d 10, 13 (1st Cir. 1992); United States v.

Perkins, 926 F.2d 1271, 1283 (1st Cir. 1991). In this case,

defendants fail to get past the second prong of the test.

The district court's instruction, which states that a

defendant must have "the purpose of advancing or furthering" the

unlawful purpose of the conspiracy, substantially covers the

substance of defendant's proffered instruction. The judge also

informed the jury that defendant had to "willfully join[]" the

conspiracy, that defendant had to have both the intent to agree

to join the conspiracy and the specific intent to commit bank

fraud, and that defendant had to have the intent to participate

in the unlawful scheme. All of these instructions together more

than adequately address the requirements of Direct Sales and

Falcone that defendant must join the conspiracy with the specific

intent to accomplish its illegal purpose. See United States v.

-85-

Arias-Santana, 964 F.2d 1262, 1268 (1st Cir. 1992) (finding no

error where jury charge covered the substance of defendant's

requests); McGill, 953 F.2d at 12-13 (same). We have upheld the

adequacy of nearly identical instructions in the past. See

United States v. Hensel, 699 F.2d 18, 37-38 (1st Cir. 1983).

The defendants focus on the fact that the trial judge

did not explicitly state that mere knowledge by the defendant

that the goods he or she provides to a conspiracy will be used

illegally is not sufficient to prove an intent to join the

conspiracy. This instruction, defendants allege, is necessary to

properly define "intent to participate" or "intent to join" a

conspiracy. Without an expression of the innocent case, they

add, the instructions leave open the door for the impermissible

inference that a defendant can be guilty of conspiring to defraud

Bay Loan simply by providing money to Dean Street knowing it

would be used illegally. Defendants claim that because the murky

distinction between lawful cooperation and illegal participation

is especially close in this case, the district court had a

special obligation to be clear.

In some situations, this type of "negative" Direct

Sales instruction might be required, but we see nothing in the

facts of this case that makes the distinction between simply

knowing of the illegal nature of the scheme and agreeing to

further the scheme particularly crucial to the defense. The

central defense of most defendants was that they did not know

that Dean Street was doing anything illegal in obtaining the

-86-

loans. Once knowledge of illegality is established, the evidence

of defendants' participation, as opposed to merely providing

goods and services to the conspiracy, is overwhelming and not, as

defendants assert, a close call. See supra Section IV.

In any event, we think the trial court's instructions

were quite clear that (1) "[i]n order to be a member of a

conspiracy, a Defendant must have willfully joined it or

participated in it for the purpose of advancing or furthering its

unlawful purpose"; and (2) that defendant must have both an

intent to agree to join the conspiracy and the specific intent to

commit bank fraud. These instructions adequately defined the

requisite "intent to participate" and foreclosed any inference

that knowingly providing goods to a criminal enterprise is itself

sufficient to support a finding of intent to join the conspiracy.

The trial court need not employ the most elegant or concise

phraseology nor must it incorporate the precise language of

defendants' request as long as the instructions taken as a whole

"accurately communicated the meat of the defense's theory."

McGill, 953 F.2d at 12. In this case, the court's instructions

adequately communicated the defendants' theory that mere

knowledge and assistance, without an intent to further the

enterprise, is not enough.

B. Instruction On Multiple Conspiracies

The defendants also challenge the trial court's refusal

to instruct the jury as to the possibility of multiple

-87-

conspiracies.68 Such an instruction was warranted, they claim,

because the evidence indicated that different defendants had

different relationships with Dean Street and were involved in

separate schemes. Although the judge may have erred in refusing

to charge multiple conspiracies, we find insufficient prejudice

to warrant a reversal of the convictions.

A trial court should grant a defendant's request for a

multiple conspiracy instruction if, "on the evidence adduced at

trial, a reasonable jury could find more than one such illicit

agreement, or could find an agreement different from the one

charged." United States v. Boylan, 898 F.2d 230, 243 (1st Cir.

1990); see also United States v. Dennis, 917 F.2d 1031, 1033 (7th

Cir. 1990); United States v. Dwyer, 843 F.2d 60, 61-62 (1st Cir.

1988). As it is highly likely that the voluminous and complex

record in this case, viewed in the light most favorable to the

68 The defendants' proffered instruction stated in part:

Where persons have joined together to
further one common unlawful design or
purpose, a single conspiracy exists. By
way of contrast, multiple conspiracies
exist when there are separate unlawful
agreements to achieve distinct purposes.
. . . .
In deciding whether a single overall
conspiracy as charged in the indictment
has been proven beyond a reasonable doubt
you should look at whether there were
multiple agreements reached, whether
there were additions or withdrawals of
alleged conspirators, and most
significantly, whether the evidence shows
beyond a reasonable doubt that all of the
alleged conspirators directed their
efforts toward the accomplishment of a
common goal or overall plan.

-88-

defendants, would allow for a plausible conclusion that more than

one conspiracy took place, we start from the assumption that the

trial court erred in its failure to give the multiple conspiracy

instructions. Our task, then, is to determine if the degree of

prejudice from the possible error necessitates a reversal. We

find that it does not.

We will reverse a court's erroneous refusal to give a

substantively correct instruction only when that instruction

concerned an important point such that the failure to give it

seriously undermined the defendant's ability to effectively

present a given defense. United States v. McGill, 953 F.2d 10,

13 (1st Cir. 1992); United States v. Perkins, 926 F.2d 1271, 1283

(1st Cir. 1991). In the context of alleged multiple

conspiracies, the defendant's main concern is that jurors will be

misled into attributing guilt to a particular defendant based on

evidence presented against others who were involved in a

different and separate conspiratorial scheme. Dwyer, 843 F.2d at

62; United States v. Flaherty, 668 F.2d 566, 582 (1st Cir. 1981).

The prejudice we must guard against, therefore, is evidentiary

spillover resulting from trying defendants en masse for distinct

and separate offenses committed by others. Kotteakos v. United

States, 328 U.S. 750, 756-77 (1946); see also Blumenthal v.

United States, 332 U.S. 539, 558-60 (1947).

We find the risk of evidentiary spillover to be

significantly limited in this case because we fail to see which,

if any, pieces of evidence would not be relevant to and

-89-

admissible against any of the defendants individually. Although

the record does not foreclose the possibility of multiple

conspiracies, the evidence convincingly indicates the existence

of a single, unified conspiracy in which all the defendants

participated. Thus, all of the evidence would have been

available to the jury for consideration of the government's

single conspiracy claim against each defendant regardless of the

possibility of multiple conspiracies.

Determining the number of conspiracies in a particular

case depends on a variety of factors including the "nature,

design, implementation, and logistics of the illegal activity;

the participants' modus operandi; the relevant geography; and the

scope of coconspirator involvement." Boylan, 898 F.2d at 241;

United States v. Rivera-Santiago, 872 F.2d 1073, 1079 (1st Cir.),

cert. denied, 492 U.S. 910 (1989). A single conspiracy exists

where the totality of the evidence demonstrates that "'all of the

alleged co-conspirators directed their efforts towards the

accomplishment of a common goal or overall plan.'" Boylan, 898

F.2d at 242 (quoting United States v. Drougas, 748 F.2d 8, 17

(1st Cir. 1984)); United States v. Bello-P rez, 977 F.2d 664,

667-68 (1st Cir. 1992).

The conspiracy in this case consisted of a scheme to

obtain financing for a condominium project by falsely

representing the existence of down payments that were never made.

Although some of the details and tactics changed throughout the

scheme, the main objective, structure, intended victim, and modus

-90-

operandi remained constant: the continuous recruitment of unit

buyers to submit loan applications to Bay Loan in which the down

payments were falsified in order to fraudulently avoid the bank's

down payment requirement, followed by the disbursement of Bay

Loan's loan proceeds to Dean Street. Defendants all worked

together interdependently to further the entire scheme. Hagopian

and Ward recruited buyers, Gauvin, Granoff and Reisch provided

the buyers with down payment funds, Kumalae and Landman

facilitated the fraudulent representation of the down payments,

and Brandon coordinated the entire conspiracy. With the

exception of Gauvin and Granoff, all of the defendants played

essentially the same role throughout the entire operation of the

conspiracy.69 Gauvin and Granoff stopped providing down

payment funds after Brandon stopped giving them their money back;

however, negotiations between Brandon and the two continued until

the scheme ended. Regardless, the cessation of Gauvin's and

Granoff's funding did not represent the end of one conspiracy and

the beginning of a second one but a snag in the ongoing operation

of the single conspiracy. See United States v. Aracri, 968 F.2d

1512, 1522 (2d Cir. 1992) (finding acrimony among participants of

conspiracy consistent with single conspiracy).

Defendants' arguments for distinguishing different

conspiracies have all been previously rejected and none of the

factors they highlight indicates the existence of multiple

69 Hagopian and Ward joined the scheme just two months after the
first condominium sales.

-91-

conspiracies. The presence of different methods of falsifying

the down payments -- e.g., recycled funds, nonnegotiated checks,

dischargeable mortgages -- does not create separate conspiracies.

See, e.g., Aracri, 968 F.2d at 1521-23; United States v. Aponte-

Su rez, 905 F.2d 483, 486-88 (1st Cir.), cert. denied, 498 U.S.

990 (1990); United States v. Crosby, 294 F.2d 928, 945 (2d Cir.

1961), cert. denied, 368 U.S. 984 (1962). This is especially

true because the various methods were used interchangeably and

often simultaneously in furtherance of an identical objective.

Likewise, the differing relationships various defendants had with

the head conspirator, Brandon, does not signify that multiple

conspiracies existed. See United States v. Bello-P rez, 977 F.2d

664, 668 (1st Cir. 1992); United States v. Townsend, 924 F.2d

1385, 1389 (7th Cir. 1991) ("The crime of conspiracy focuses on

agreements, not groups.").70 The fact that different

defendants were involved in separate transactions for the

purchase of different properties at different motels is not

significant so long as there is a single continuing plan. See

Boylan, 898 F.2d at 242; Drougas, 748 F.2d at 8; United States v.

70 The present conspiracy is not, as defendants allege, the type
of conspiracy discussed in Kotteakos, 328 U.S. at 753-55, where

different conspirators had separate and independent relationships
with the hub conspirator and were thus separate spokes on a
rimless wheel. Here, all the defendants were part of an
integrated, interdependent scheme in which each defendant
depended upon and was connected to the others. The scheme could
not function without a steady stream of new buyers recruited by
Hagopian and Ward. New buyers were useless, however, unless they
could get down payment funds provided by Gauvin, Granoff, and
Reisch. In turn, down payment funds could not be properly
recycled or falsified to defraud the bank unless Landman and
Kumalae facilitated the transactions.

-92-

Kelley, 849 F.2d 999, 1003 (6th Cir.), cert. denied, 488 U.S. 982

(1988). Finally, the fact that Dean Street was engaged in other

licit and illicit commercial enterprises does not relate to the

present case against defendants and is irrelevant.

Almost all aspects of the government's case describing

the scheme to defraud Bay Loan were relevant to each defendant's

respective role in the conspiracy. Thus, we see no risk that the

jury based a defendant's conviction on evidence relating to an

unrelated offense. The lack of prejudice is underscored by the

fact that ample evidence was presented against each individual

defendant based on each defendant's actions and statements. See

supra Section IV. The jury did not need to rely on evidence

relating specifically to other defendants in order to convict.

In addition, the judge repeatedly cautioned the jury to assess

the evidence separately against each defendant.71 See Boylan,

898 F.2d at 244 (finding similar instructions contributed to

protecting defendant's rights).

C. Willful Blindness Instruction

71 The district court also told the jury to determine each
charge against each defendant based only on the evidence against
that defendant on that charge. More significantly, the judge
also cautioned the jury:

to consider only the evidence regarding
that Defendant's actions or the actions
of individuals belonging to a conspiracy
to which that Defendant also belonged.
That is to say, it would be improper to
return a guilty verdict with respect to a
Defendant based on evidence relating to
acts committed by someone belonging to a
conspiracy of which the Defendant was not
a member.

-93-

The district court instructed the jury that "in

deciding whether a Defendant acted knowingly, you may infer

knowledge of a fact if you find beyond a reasonable doubt that

the Defendant deliberately closed his or her eyes to a fact that

otherwise would have been obvious to that Defendant."72 The

evidence supporting this instruction related only to defendant

Landman but the instruction was given generally for all

defendants without any mention of Landman's name. Defendants

claim the instruction was reversible error because it was not

applicable to this case and because it caused the jury to convict

defendants without finding sufficient evidence of knowledge

beyond a reasonable doubt.

We find, first of all, that the instruction was

72 The rest of the court's willful blindness instruction stated:

In order to infer knowledge, you must
find that two things have been
established.

First, that the Defendant was aware of a
high probability of the fact in question.

And second, that the Defendant
consciously and deliberately avoided
learning of those facts. That is to say,
that the Defendant willfully made himself
blind to those facts. It is entirely up
to you to determine whether a Defendant
deliberately closed his or her eyes to
the facts and, if so, what inference, if
any, should be drawn.

However, it is important to bear in mind
that mere negligence or mistake in
failing to learn the facts is not
sufficient. There must be a deliberate
effort to remain ignorant of the facts.

-94-

appropriate and accurate as to defendant Landman; hence, no error

was made in his case. The trial court may instruct the jury

concerning willful blindness when a defendant claims a lack of

knowledge, the facts support an inference of defendant's

conscious course of deliberate ignorance, and the instruction,

taken as a whole, cannot be misunderstood by a juror as mandating

the inference of knowledge. United States v. St. Michael's

Credit Union, 880 F.2d 579, 584 (1st Cir. 1989); United States v.

Picciandra, 788 F.2d 39, 46 (1st Cir.), cert. denied, 479 U.S.

847 (1986). More specifically, the instruction is proper when

there is evidence to "support the inference that the defendant

was aware of a high probability of the existence of the fact in

question and purposely contrived to avoid learning all of the

facts in order to have a defense in the event of a subsequent

prosecution." United States v. Rivera, 944 F.2d 1563, 1571 (11th

Cir. 1991) (citing United States v. Alvarado, 838 F.2d 311, 314

(9th Cir. 1987), cert. denied, 487 U.S. 1222 (1988)).

The core of Landman's defense as argued at trial was

that he was simply doing his job as an escrow agent in receiving

and dispersing funds at the direction of Dean Street and that he

did not know that the transactions he was involved in were

illegally defrauding the bank.73 As discussed in Section IV,

73 Landman made this argument in various motions before the
judge and before the jury which satisfies the first requirement
that the defendant claim a lack of knowledge. It is not the
case, as Landman argues, that a defendant must testify or present
evidence indicating a lack of knowledge before a willful
blindness instruction can be deemed appropriate. See United

States v. Lizotte, 856 F.2d 341, 343 (1st Cir. 1988).

-95-

sufficient evidence exists that Landman knew down payments were

required. The evidence also supports the conclusion that Landman

knew about the scheme to fraudulently represent the existence of

down payments.74 However, on cross-examination, the defense

attempted to impeach Marderosian's testimony that he told Landman

about the dischargeable second mortgages to be given to the

buyers which called into question a key piece of evidence

regarding Landman's knowledge. There was, nevertheless, evidence

that Landman tried to avoid learning of particular buyers' use of

dischargeable mortgages for their down payments. During several

closings Landman was asked by buyers about the second mortgages.

On one occasion, he told the buyer that he "didn't want to know

anything about it." At other times, Landman gestured in a way

that one buyer described as trying to say "not in front of me."

This evidence is sufficient to support the district

court's willful blindness instruction. The attempt to avoid

discussion of dischargeable mortgages with the buyers can be

interpreted as a "pattern of behavior predicated upon a knowledge

of the conspiracy together with a desire to limit inculpatory

evidence of complicity." United States v. Ciampaglia, 628 F.2d

632, 643 (1st Cir.), cert. denied, 449 U.S. 956, 1038 (1980).

74 We reject the argument that proof of direct knowledge
precludes a willful blindness instruction that is otherwise
appropriate. As long as separate and distinct evidence supports
a defendant's deliberate avoidance of knowledge and the
possibility exists that the jury does not credit the evidence of
direct knowledge, a willful blindness instruction may be
appropriate. See Lizotte, 856 F.2d at 343; United States v.

Ochoa-Fabi n, 935 F.2d 1139, 1142 (10th Cir. 1991), cert. denied,

112 S. Ct. 1565 (1992).

-96-

The actual instructions given by the district court were proper

and cannot be misunderstood as mandating an inference of

knowledge. See St. Michael's, 880 F.2d at 585 (finding similar

language proper); United States v. Ochoa-Fabi n, 935 F.2d 1139

(10th Cir. 1991), cert. denied, 112 S. Ct. 1565 (1992) (same);

United States v. Hiland, 909 F.2d 1114, 1130 (8th Cir. 1990)

(same). Significantly, the court said the jury "may infer

knowledge" (emphasis added) and that it was "entirely up to" the

jury to find deliberate blindness. See Ciampaglia, 628 F.2d at

642.75

Unlike the case against Landman, the evidence did not

warrant a willful blindness instruction for the other seven

defendants. This left the trial judge with a difficult decision.

He could either, (1) give no willful blindness instruction even

though it was warranted; (2) give the instruction only for

defendant Landman and thus highlight the evidence against him; or

(3) give a general instruction for all the defendants. We do not

think the judge erred by choosing the third option.

75 The holding in United States v. Mankani, 738 F.2d 538, 547 &

n.1 (2d Cir. 1984) does not apply in this case. First of all, at
most, Mankani stands for the specific proposition that a

"conscious avoidance" instruction cannot be used to establish
membership in a conspiracy and not the more general proposition
that the instruction is never proper in a conspiracy case. The
willful blindness instruction in this case had to do with the
finding that "defendant acted knowingly" and not with a finding
that defendant willfully joined the conspiracy. In any event, to
the extent our holding in this case differs from that in Mankani,

we agree with the Seventh Circuit that a willful blindness
instruction can be permissible with respect to a conspiracy
charge. United States v. D az, 864 F.2d 544, 549 (7th Cir.

1988), cert. denied, 490 U.S. 1070 (1989) (citing United States

v. Kehm, 799 F.2d 354, 362 (7th Cir. 1986)).

-97-

Assigning error to the district court's decision to

give the general instruction puts the court in an impossible

position because the government is entitled to the willful

blindness instruction as to Landman and the judge is entitled in

turn to give an instruction that would not turn the spotlight on

a single defendant. On the facts of this case, we are satisfied

that the jury could be expected to apply the instruction properly

to defendants whose conduct arguably calls for that application

and not randomly or recklessly to defendants who do not deserve

the instruction. It is common during multi-defendant trials for

the court to give a number of boilerplate instructions --

concerning, for example, a missing witnesses, accomplice

liability, or withdrawal from the conspiracy -- that are

pertinent, on particular facts, to only one defendant and not to

the others. The instruction in this case is similar in many

respects to these other instructions and is equally appropriate

given the risk of prejudice to the other defendants is low. We

do not exclude the possibility that, on particular facts, it

might so mislead a jury to give a general instruction, rather

than one tailored to a specific defendant or rather than no

instruction at all, as to be an abuse of discretion, but we

emphasize that judgments of this kind are primarily entrusted in

the trial judge who inevitably has a superior feel for the

dynamics of the trial and the likely reaction of the jury.

The danger of an improper willful blindness instruction

is "'the possibility that the jury will be led to employ a

-98-

negligence standard and convict a defendant on the impermissible

ground that he should have known [an illegal act] was taking

place.'" United States v. Littlefield, 840 F.2d 143, 148 n.3

(1st Cir.), cert. denied, 488 U.S. 860 (1988) (quoting United

States v. White, 794 F.2d 367, 371 (8th Cir. 1986)) (additional

citation omitted). In this case, as in Littlefield, 840 F.2d at

147-48, the willful blindness instruction clearly had little, if

any, effect on the jury's verdict. First of all, unlike those

cases where insufficient facts were present to support any

willful blindness instruction at all, see, e.g., United States

v. Barnhart, 979 F.2d 647, 651-53 (8th Cir. 1992); United States

v. Alvarado, 838 F.2d 311, 316 (9th Cir. 1987), cert. denied, 487

U.S. 1222 (1988), this case involved an instruction that was

proper for at least one defendant. The jury had an opportunity

to correctly apply the instruction and was less likely to

improperly consider a defendant's willful blindness in

conjunction with facts that only supported that defendant's

direct knowledge, or complete lack of knowledge. Thus, there was

little risk that the jury was confused into convicting a

defendant who merely should have known about the criminal

venture. See United States v. D az, 864 F.2d 544, 551 (7th Cir.

1988); see also Rivera, 944 F.2d at 1570-71.

In addition, the instructions properly and clearly

directed the jury not to find knowledge based on mere negligence

and extensively instructed the jury as to the requirements for

finding knowing participation in the conspiracy and knowing

-99-

execution of bank fraud. See Littlefield, 840 F.2d at 147-48;

D az, 864 F.2d at 551. The court instructed the jury that "mere

negligence or mistake in failing to learn the facts is not

sufficient" and that a defendant's willful ignorance had to be

deliberate beyond a reasonable doubt. Throughout the

instructions, the court told the jury that the government had to

prove each and every element of the offenses, including those

elements requiring knowledge, beyond a reasonable doubt. For

example, knowing participation in the scheme to defraud required

the actions of each defendant to be "done voluntarily and

intentionally and not because of mistake or accident or some

other innocent reason." The court was clear that to prove

participation in a conspiracy, the government must show that a

"defendant knew of the existence of the conspiracy and its

unlawful purpose" and the court added that "knowledge and

willfulness like all of the other elements of a crime must be

established beyond a reasonable doubt." Twice the district court

explained that actual proof of knowledge was essential "to insure

that no one will be convicted for an act that he or she did not

intend to commit or the nature of which he or she did not

understand."

The instructions, taken as a whole, went a long way

toward curing any possible prejudice that may have resulted from

the willful blindness instruction. As evidence of this, the jury

delivered verdicts that demonstrated it was not confused or

affected by the willful blindness instruction. Three defendants

-100-

were acquitted on multiple bank fraud counts and a fourth was

acquitted on one count of bank fraud. Defendant Landman was

acquitted on one count in which the principal witness testified

that Landman did not want to know about the second mortgage

discharges. Thus, it appears that the jury declined to apply the

willful blindness instruction when it was given the first clear

opportunity to do so. We therefore find no error in the court's

decision to give a general willful blindness instruction.

X. REHEARING OF TESTIMONY BY THE JURY

Defendant Gauvin assigns error to the district court's

failure to read back certain testimony to the jury in response to

the jury's request. Four days into the jury's deliberations, the

jury asked to rehear several areas of testimony. One jury

request stated: "We would also like to review the testimony of

Mr. Marderosian concerning a meeting in which Mr. Gauvin,

Mr. Granoff and Mr. Brandon discussed the purchase of Pidge and

Meeting Street." As several references were made to Pidge and

Meeting Street it was not clear which discussion the jury was

referring to. The court and the attorneys spent nearly two days

trying to cull together the parts of the transcript that related

to all of the requested subject matter. At one point, the court

suggested, and the prosecutor later argued, that the entire

transcript of Marderosian's testimony should be provided to the

jury, but counsel for Granoff objected to this suggestion.

The court read to the jury a portion of Marderosian's

testimony relating to Pidge and Meeting Street and to a meeting

-101-

where the Pidge project was discussed. Against the objection of

Gauvin's counsel, the court stopped reading the transcript just

before testimony concerning additional meetings relating to the

same deal as the one involving Pidge and Meeting Street but not

specifically mentioning Pidge or Meeting Street. We find no

abuse of discretion in the trial judge's decision not to read

additional portions of the transcript.

The decision to reread testimony rests entirely upon

the trial court's sound discretion. United States v. Akitoye,

923 F.2d 221, 226 (1st Cir. 1991); United States v. Argentine,

814 F.2d 783, 787 (1st Cir. 1987) (citing United States v.

Almonte, 594 F.2d 261, 265 (1st Cir. 1979)). The exercise of

that discretion should not be disturbed absent good reason.

Argentine, 814 F.2d at 787.

In this case, the trial judge, with advice of counsel,

reviewed the record for two days in order to locate material

responsive to the jury's request. Faced with a request for

testimony relating to a meeting discussing "Pidge and Meeting

Street" and faced with multiple references to Pidge and Meeting

Street in the record, the judge decided to read testimony

concerning a meeting where Pidge was mentioned but not to read

testimony relating to a subsequent meeting in which Pidge and

Meeting Street were not mentioned. We find this decision to be

appropriately within the judge's discretion.

The fact that the omitted testimony concerned the same

deal as the one involving Pidge and Meeting Street and the fact

-102-

that it also contained some discussion of down payment

arrangements does not suggest any abuse of discretion. First of

all, to the extent the omitted testimony is crucial to Gauvin's

defense, as he claims, we find the testimony to be more

inculpatory in nature than exculpatory.76 More importantly,

the judge was attempting to respond appropriately to a jury

request that turned out to be far from narrowly focussed. See

76 The omitted testimony included the following:

A. Mr. Brandon explained to Mr. Gauvin
and Mr. Granoff that Homeowners required
a twenty-five percent down payment and
while that down payment would not be
required of Mr. Gauvin and Mr. Granoff,
he did have the problem of the down
payment with subsequent purchasers and he
asked Mr. Gauvin and Mr. Granoff for
their assistance in meeting that problem.

Q. What, if anything did Mr. Gauvin
respond?

A. Mr. Gauvin, as I recall, initially,
didn't quite understand what Mr. Brandon
wanted and after further explanation,
Mr. Gauvin responded that he might be
interested under some circumstances in
helping out.

Q. What about Mr. Granoff?

A. I believe Mr. Granoff indicated his
consent also.

Defendant Gauvin claims this testimony was crucial to his
defense because it corrects a mischaracterization in the
government's closing argument about what Marderosian said about
the down payments. Defense counsel explicitly told the jury to
review the testimony regarding the alleged mischaracterization.
We have some doubts, given the request for a meeting concerning
"Pidge and Meeting Streets," that this particular request was
related to the issue of the alleged mischaracterization. In any
event, we find no abuse of discretion in the judge's decision
that the omitted material was not what the jury was looking for.

-103-

Akitoye, 923 F.2d at 226. The extra burdens on the court created

by rehearing testimony is relevant to judging the reasonableness

of the court's refusal to read back testimony to the jury. See

id. If the trial judge had searched for all the testimony

related to the deal involving Pidge and Meeting Street or all the

discussions of down payment arrangements for that deal, the judge

would have had to spend considerably more time and effort than he

had already expended. Such extra effort was not required.

XI. REFUSAL TO APPOINT PARALEGAL FOR BRANDON

Defendant Brandon alleges that the trial court's denial

of his request for a court-appointed paralegal denied him his due

process right to present a defense. Prior to the indictment, the

Federal Bureau of Investigation took possession of 137 file boxes

from Dean Street's offices which contained documents kept by Dean

Street. Although Brandon was given complete access to the files,

he claims that without the services of a paralegal he and his

court-appointed attorney were incapable of meaningfully examining

the contents of the files, effectively denying him access to

potentially exculpatory evidence. Brandon and his attorney did

spend four hours one afternoon examining the contents of three of

the file boxes.

Defendant cites Brady v. Maryland, 373 U.S. 83 (1963),

and its progeny for the proposition that his due process rights

were violated. Brady requires the government to disclose any

exculpatory evidence that is "material either to guilt or to

punishment." Brady, 373 U.S. at 87. Before we even reach the

-104-

issue of whether the lack of paralegal services effectively

constituted a failure of the government to disclose evidence, we

must first consider whether the defendant established that the

file boxes contained potentially exculpatory, or even material,

evidence in the first place.

To establish a violation of Brady, a defendant must

provide the court with some indication that the materials to

which he or she needs access contain material and potentially

exculpatory evidence. See United States v. Bagley, 473 U.S. 667,

674 (1985); cf. United States v. Mateos-S nchez, 864 F.2d 232,

240 (1st Cir. 1988) (holding that a Criminal Justice Act rule, 18

U.S.C. 3006A(e)(1), which provides for the provision to

defendants of necessary investigative or other services, requires

a defendant to make at least some showing why the requested

assistance would produce evidence "likely to be pivotal to his

defense"). In his initial request before the trial court and

subsequently on appeal, the defendant speculated that the Dean

Street files might contain exculpatory evidence. Brandon never

presented, however, any supporting evidence or arguments to

indicate this was, in fact, the case. Because Brandon did not

make any showing at all as to the nature of the disputed

materials, we find no error in the court's refusal to appoint a

paralegal for Brandon's defense.

This is not a Catch-22 situation in which defendant

cannot make the initial showing needed to get a paralegal without

first having a paralegal to assist in making the initial showing.

-105-

Instead, the defendant can establish the possible existence of

material and exculpatory evidence by, at the very least,

describing the kinds of documents that might be in files which,

if they were found, might exculpate the defendant.77 At most,

defendant and counsel could have spent a few more afternoons

looking in the files for representative samples of documents that

might be useful to the defense. We do not think this places too

much of a burden on defendant or defendant's counsel.

XII. CUMULATIVE EFFECT OF ERRORS

Defendants argue that the cumulative effect of numerous

alleged errors made before and during the trial deprived them of

a fair trial and enabled the jury to convict despite the lack of

evidence against each individual defendant. Our review of the

record and trial proceedings as a whole does not reveal pervasive

unfairness or any error or combination of errors that deprived

the defendants of due process. See United States v. Barnett, 989

F.2d 546, 560 (1st Cir.), cert. denied, 114 S. Ct. 148 (1993);

United States v. Steffen, 641 F.2d 591, 598 (8th Cir.), cert.

denied, 452 U.S. 943 (1981). We thus conclude that defendants

received a fair trial.

XIII. SENTENCING

77 Brandon posits in his brief that the files may have contained
a letter from Bay Loan acknowledging that no down payments were
required. This example was not pointed out to the trial judge.
Even if the example was presented at trial, however, it would
probably not, by itself, be sufficient to establish the existence
of material exculpatory evidence without some additional
substantiation. Defendant made no claim as to the probability
such a letter exists nor provided an affidavit that he received
such correspondence.

-106-

A. Amount of Loss and Relevant Conduct

Defendants attack the district court's determination

and apportionment of Bay Loan's losses for the purpose of

calculating their sentences under the Sentencing Guidelines.78

The district court set the offense level for each defendant based

on the actual loss to Bay Loan resulting from the scheme to

defraud. See U.S.S.G. 2F1.1; United States v. Haggert, 980

F.2d 8, 11-12 (1st Cir. 1992). The court arrived at a figure of

$11.4 million by reducing the outstanding principal amount of the

fraudulently obtained end loans by, among other things, the value

of the collateral used to secure them. The court then included

the entire amount of the loss in the calculation of each

defendant's offense level under 2F1.1. The resulting total

offense level was set by adding an 11-level increase to the base

offense level because the total loss was over $5,000,000, the

highest point on the loss scale at that time. U.S.S.G.

2F1.1(b)(1).

The defendants first challenge the district court's

valuation of the collateral used to secure the loans. We review

the valuation for clear error. United States v. St. Cyr, 977

F.2d 698, 701 (1st Cir. 1992). Determination of actual loss need

not be precise; "[t]he court need only make a reasonable estimate

of the range of loss, given the available information." U.S.S.G.

2F1.1 comment note 8.

78 The district court applied the 1988 version of the Sentencing
Guidelines and therefore all citations, unless otherwise
indicated, are to that version.

-107-

The court determined the value of the collateral used

to secure the loan after an evidentiary hearing with respect to

the amount of loss. At this hearing, the court heard testimony

by Bay Loan's president and a real estate appraiser called by the

defense. The court also reviewed exhibits containing information

on the value of each of the motel condominiums. Defendants argue

that the $2.7 million dollar figure chosen by the court as the

total value of the collateral (the motels) was improperly based

on a 1991 appraisal as opposed to an earlier 1989 appraisal for

$7.8 million. Defendant seems to argue that the earlier

appraisal is the more accurate one because it was made closer to

the time of the crime and because the latter appraisal is more

likely to be affected by causes not related to the actions of

defendants. Given the evidentiary basis -- a professionally

prepared appraisal -- for the trial court's determination of

loss, however, we do not see any error, let alone clear error, in

the court's decision to choose the lower valuation of the

collateral.

A more significant objection raised by many of the

defendants is that the court improperly assigned to each of them

the entire value of the loss regardless of their degree of

participation in the scheme to defraud Bay Loan. The Guidelines

provide that for conspiracy convictions, relevant conduct

"includes conduct in furtherance of the conspiracy that was known

to or was reasonably foreseeable by the defendant." U.S.S.G.

1B1.3(a)(1) comment note 1; see also United States v. O'Campo,

-108-

973 F.2d 1015, 1023 (1st Cir. 1992). This language has been

subsequently clarified to state that relevant conduct includes

"all reasonably foreseeable acts and omissions of others in

furtherance of the jointly undertaken criminal activity."

U.S.S.G. 1B1.3(a)(1)(B), 1993 Guidelines. The clarification

was designed to highlight the distinction between the scope of

criminal liability and the scope of sentencing accountability.

Regardless, "[t]he central concept then is foreseeability."

O'Campo, 973 F.2d at 1023.

There is first the question in this case of whether the

district court applied the correct standard of foreseeability.

Defendants argue that instead of limiting the determination of

losses that each individual defendant could foresee solely to

those losses connected with the criminal activity that a

particular defendant agreed to jointly undertake,79 the court

simply held all the defendants responsible for all the losses

attributable to the entire scope of the conspiracy. See, e.g.,

United States v. Lanni, 970 F.2d 1092 (2d Cir. 1992). While it

is true that the criminal venture a defendant intended to join is

79 The 1993 Guidelines define, in a rather unilluminating
fashion, "criminal activity the particular defendant agreed to
jointly undertake" as "the scope of the specific conduct and
objectives embraced by the defendant's agreement." U.S.S.G.
1B1.3 comment note 2, 1993 Guidelines. The Guidelines go on to
point out that "the criminal activity that the defendant agreed
to jointly undertake, and the reasonably foreseeable conduct of
others in furtherance of that criminal activity, are not
necessarily identical." Id. In other words, one can reasonably

foresee conduct in furtherance of an agreed upon enterprise even
though one did not specifically agree to join in that particular
conduct. Id.

-109-

not necessarily the same as the scope of the entire conspiracy,

U.S.S.G. 1B1.3 comment note 2, 1993 Guidelines, there is no

reason why a defendant cannot intend to join and thus foresee the

operation of the entire conspiracy. As the Guidelines

acknowledge, the two can be coterminous, although "not

necessarily" so.

In this case, the district court did find the scope of

the conspiracy and the scope of the foreseeable conduct in

furtherance of each defendant's jointly undertaken criminal

activity to be the same. The judge held the defendants

responsible for "acts of co-conspirators to the extent that those

acts were committed in furtherance of the conspiracy and were

known to or reasonably foreseeable by the Defendant." The judge

then recited all the actions taken by each defendant which

indicated they were involved in the entire breadth of the

conspiracy.80 Most telling is the judge's statement during

sentencing that "the agreement that each [defendant] entered into

was to participate in a continuing scheme to obtain loans from

Bay Loan by means of fraudulent misrepresentations." Although

the sentencing judge did not employ all the expository language

recently added to the Guidelines, it is evident from the record

that he conducted the proper analysis. We thus see no error in

80 This is not a case where the sentencing court merely found
that the defendant "knew what was going on." See O'Campo, 973

F.2d at 1025. The judge in this case recounted specific facts
regarding each individual defendant which indicated that each
defendant embraced the full scope of the scheme to defraud Bay
Loan. See id. at 1025-26 n.11.

-110-

the district court's application of the Guidelines.

Several defendants contend that some portion of the

loss was not foreseeable to them because of their limited

participation in the scheme. Each claims the court should have

reduced by some unspecified amount the loss attributable to him

or her as relevant conduct. The determination of what a

defendant can foresee for the purposes of determining relevant

conduct at sentencing is inherently fact-bound and, consequently,

reviewable only for clear error. United States v. Innamorati,

996 F.2d 456, 489 (1st Cir. 1993).

All the defendants, except Hagopian, Ward and Kumalae,

were involved in the scheme to defraud Bay Loan from the very

beginning. Before the scheme was first executed, Brandon

discussed with Reisch methods to avoid making down payments on

the end loans. The first unit sales were made to Gauvin and

Granoff with Landman acting as escrow agent. The involvement of

these defendants continued throughout the scheme and we find no

clearly discernable limits to the scope of the criminal venture

in which they agreed to participate such that the district court

erred in finding all the losses from the entire conspiracy to be

foreseeable. The fact that Gauvin and Granoff stopped lending

down payment funds after February of 1988 does not absolve them

of responsibility for the continued actions of the conspiracy to

obtain more loans from Bay Loan. The issue is not whether the

two continued to commit acts in furtherance of the scheme but

whether, at the time of the relevant conduct, they reasonably

-111-

could have foreseen the actions of the other members of the

conspiracy. The evidence, particularly the ongoing

correspondence with Brandon made until the end of the scheme,

clearly indicates that Gauvin and Granoff not only could foresee

the continued sale of condominium units, they actually knew about

it.81

We have recently held that a defendant's base offense

level cannot be based on knowledge of historic facts. O'Campo,

973 F.2d at 1022-26. Thus, with respect to Hagopian, Ward and

Kumalae, losses attributable to fraudulent activity that occurred

before they became involved in the conspiracy cannot be

considered as relevant conduct. See id. The judge's error82

in this regard, however, had no effect on their sentences so we

find no reason for reversal on this issue.

Hagopian and Ward did not become involved in the

81 We disagree with Gauvin and Granoff that the evidence clearly
indicates some kind of withdrawal from the conspiracy so that the
scope of the criminal venture in which they participated was
limited to something less than the entire conspiracy. The trial
judge carefully considered this issue and we see no clear error
in his rejection of their arguments.

Similar arguments are made by Hagopian, Ward and Reisch to the
effect that they were not responsible for sales arranged by other
brokers or funded by other people. These arguments are
unavailing. The defendants agreed to participate in the entire
operation, even though their individual role may have been
limited to a specific function within the broader scheme.
Consequently, only a showing of the foreseeability of the other
co-conspirators' conduct is required to find that conduct
relevant for sentencing purposes. That standard, as the
sentencing judge correctly found, was clearly met.

82 We note that, to the district judge's credit, the O'Campo

decision settling this issue was not handed down until after the
judge conducted the sentencing of the defendants in this case.

-112-

conspiracy until after October of 1987, after all of the

Charlestown units had already been sold. Kumalae did not join

until after some units had already been sold at the Bayside, the

second motel involved in the scheme. It may well be arguable

that the total losses to Bay Loan resulted from conduct occurring

after the participation of these three defendants. When

Hagopian, Ward and Kumalae joined the conspiracy, payments were

being made on the end loans. It was not until the scheme to

defraud expanded to more and more condominium units that it began

to collapse under its own weight as additional loan funds from

Bay Loan were required to pay off the existing obligations. The

conduct of Hagopian, Ward and Kumalae, therefore, contributed to

the overall losses to Bay Loan which took place when the loans

defaulted.

More importantly, however, even if the losses resulting

from the loans made for the Charlestown and Bayside units are

excluded from the loss calculation for Hagopian, Ward and

Kumalae, the total would still be well over $5 million, the

highest level under the 1988 version of U.S.S.G. 2F1.1. A

lion's share of the loans were made for units in the five other

motels after all the defendants had joined the conspiracy.

Therefore, any error in apportioning losses was harmless because

it did not affect the offense level assigned to each

defendant.83

83 We also find no error in the district court's refusal to take
into account multiple causes for Bay Loan's losses in determining
the sentences. "'[T]he victim loss table in U.S.S.G.

-113-

B. Upward Adjustments for More Than Minimal Planning

Defendants Granoff, Ward and Landman argue that the

district court committed clear error by imposing a two-level

increase in their offense levels, pursuant to U.S.S.G.

2F1.1(b)(2)(A), for more than minimal planning.84 "More than

minimal planning" is defined as:

[M]ore planning than is typical for
commission of the offense in a simple
form. "More than minimal planning" also
exists if significant affirmative steps
were taken to conceal the offense.

"More than minimal planning" is deemed
present in any case involving repeated
acts over a period of time, unless it is
clear that each instance was purely
opportune. Consequently, this adjustment
will apply especially frequently in
property offenses.

U.S.S.G. 1B1.1, comment note 1(f).

We review the district court's minimal planning

2F1.1(b)(1) presumes that the defendant alone is responsible for
the entire amount of victim loss specified in the particular loss
range selected by the sentencing court.'" United States v.

Shattuck, 961 F.2d 1012, 1016 (1st Cir. 1992) (quoting United

States v. Gregorio, 956 F.2d 341, 347 (1st Cir. 1992)). The

Guidelines treat multiple causation only as a possible ground for
downward departure -- a matter within the sound discretion of the
sentencing court. Shattuck, 961 F.2d at 1017; Gregorio, 956 F.2d

at 346-48. In this case, the sentencing court, upon extensive
consideration of the issue, declined to grant such a departure.
None of the factors that defendants point to as allegedly
contributing to Bay Loan's losses are so compelling as to
convince us that the court erred in reaching its decision.

84 To the extent defendant Gauvin also appeals this decision by
reference in his brief to arguments made by the other defendants
we find no error. As there is no error with regard to defendant
Granoff, there can also be no error for Gauvin whose involvement
in the scheme was greater than Granoff's. The same applies to
defendant Hagopian whose involvement was greater than defendant
Ward's.

-114-

assessment only for clear error. United States v. Beauchamp, 986

F.2d 1, 5 (1st Cir. 1993). We are not inclined to reverse a

finding of more than minimal planning unless the evidence compels

the conclusion that defendant's actions were purely opportune or

"spur of the moment." Gregorio, 956 F.2d at 343; United States

v. Fox, 889 F.2d 357, 361 (1st Cir. 1989) ("We cannot conceive of

how obtaining even one fraudulent loan would not require more

than minimal planning.").

In light of the rather complex and sophisticated scheme

involved in this case, we find any assignment of error to the

sentencing judge's ruling that the defendants engaged in more

than minimal planning to be rather far-fetched. In any event,

the judge made more than adequate findings based on the record to

support his decision. The judge found that Ward took the

initiative to find buyers for the scheme and helped falsify down

payments which constituted "repeated acts" over a period of time.

Ward protests that there is no evidence that he "initiated" any

of the contacts with the buyers. This is mere quibbling. Ward

was actively involved in the recruitment process, he told buyers

no down payments were required, he told buyers to provide down

payments checks that he knew would not be negotiated, and he

provided buyers with rebates for their purchases. Any one of

these facts would support a finding of more than minimal

planning.

As for defendant Granoff, the district court found that

the scheme to defraud Bay Loan involved more planning than is

-115-

typical for commission of the offense in its simple form.

Looking at the scheme as a whole, this fact is indisputable. But

this fact is also true when viewed from the perspective of

Granoff's specific involvement. Granoff first met with Brandon

in the summer of 1987 to discuss the condominium project and

eventually he agreed to purchase some units and to fund buyer

down payments. Pursuant to this agreement, Granoff purchased

four units in August of 1987 in which funds were recycled via a

sophisticated arrangement. Five months later, he provided

$470,000 to Dean Street on the understanding it would be returned

to him after it was used to fund buyers' down payments. Granoff

also formed a partnership with Gauvin to invest in the Dean

Street project. All of these activities reflect a significant

level of involvement in the scheme. We therefore find no error

in his case.

Finally, the sentencing judge found that Landman

engaged in "repeated acts" during the scheme in his role as

escrow agent or closing attorney for most of the loan

transactions. There is no basis for any error in his case.

C. Denial of Role-In-The-Offense Decrease for Marvin Granoff

Defendant Granoff claims the court erred in finding he

was not a minor participant and thus not entitled to a decrease

in his offense level pursuant to U.S.S.G 3B1.2(b). "[A] minor

participant means any participant who is less culpable than most

other participants." U.S.S.G. 3B1.2(b) comment note 3, 1993

Guidelines. No defendant, however, is automatically entitled to

-116-

a reduction, even if the defendant happens to be less culpable

than his or her co-defendants. United States v. Valencia-Lucena,

925 F.2d 506, 514 (1st Cir. 1991); United States v. Rexford, 903

F.2d 1280, 1282 (9th Cir. 1990). The sentencing court has broad

discretion in determining whether this downward departure is

appropriate and we will reverse only if the evidence

overwhelmingly demonstrates that the defendant played a part that

makes him substantially less culpable than the average

participant in the convicted offense such that the court's

decision was clearly erroneous. Gregorio, 956 F.2d at 344;

United States v. Ocasio, 914 F.2d 330, 333 (1st Cir. 1990).

Although the district court found that Granoff was less

culpable than the major participants in the scheme like Brandon,

the court found that Granoff did play more than a minor role.

The $470,000 Granoff provided to fund buyer down payments was a

significant contribution to the scheme to defraud Bay Loan. We

find that the record supports the court's finding that Granoff

was not less culpable than most of the other defendants let alone

substantially less culpable than an average defendant and we

therefore affirm Granoff's sentence.85

85 Granoff also claims that the district court erroneously
failed to depart downward based on his age and physical
condition, pursuant to U.S.S.G. 5H1.1 and 5H1.4. This issue
is not properly before the court because defendant did not seek a
downward departure on this basis during sentencing. See United

States v. Slade, 980 F.2d 27, 30 (1st Cir. 1992). The issue of

age and health were raised only with respect to the range of the
sentence and to bail pending appeal. Thus, the issue of
departure based on age and physical condition was not preserved
for appeal.

-117-

D. Costs of Supervised Release and Special Assessments

The government correctly concedes that our decision in

United States v. Corral, 964 F.2d 83, 84 (1st Cir. 1992) mandates

that we find erroneous the court's decision to impose costs of

supervised release on five defendants found to be indigent for

purposes of a punitive fine. We therefore reverse the imposition

of supervised release costs on defendants Brandon, Ward, Landman,

Hagopian, and Kumalae.

Brandon further argues that because he is indigent, the

district court was without authority to order him to pay either

restitution or the statutory assessments. In imposing an order

of restitution, the district court must consider not only the

amount of the victim's loss but also "the financial resources of

the defendant, the financial needs and earning ability of the

defendant and the defendant's dependents, and such other factors

as the court deems appropriate." 18 U.S.C. 3664(a); United

States v. Savoie, 985 F.2d 612, 618 (1st Cir. 1993).

In this case, the sentencing judge considered the

required factors and, without error, arrived at the conclusion

that a $500,000 restitution order, payable after the three year

period of supervised release, was appropriate. Specifically, the

judge stated: "[I]n arriving at that figure, Mr. Brandon, I

recognize that based on the pre-sentence report, you don't appear

to have any assets at the present time but it appears that you

have the prospect of receiving or inheriting some assets in the

future." The court also noted that a man of Brandon's talents

-118-

ought to be able to obtain gainful employment upon release.

Although the restitution order may be burdensome, and

although it may be true to some extent that "if a defendant is

indigent for purposes of one [fine], he must be indigent for

purposes of the other." United States v. Labat 915 F.2d 603, 607

(10th Cir. 1990), we do not think Corral's ban on imposing

certain fines on indigent defendants extends to restitution

orders. Corral dealt specifically with the interplay of two

provisions of the United States Sentencing Guidelines, U.S.S.G.

5E1.2(a) and 5E1.2(i). Corral, 964 F.2d at 84. We found in

that case that because the fine imposed under 5E1.2(i) was an

additional fine to be instituted only in conjunction with the

punitive fine imposed under 5E1.2(a), the former could not be

imposed once the latter was waived because of defendant's

indigency. Id. In the case of restitution, however, a separate

statutory scheme has been established which includes its own

independent consideration of defendant's ability to pay. 18

U.S.C. 3664. Therefore, the district court's determination of

indigency under U.S.S.G 5E1.2(a) in the present case is

independent of and does not affect its ruling on restitution.86

The judgments are affirmed except that the judgment of

86 To the extent Brandon also challenges the $50 statutory
assessment fee imposed for each count (totaling $1300) by the
district court pursuant to 18 U.S.C. 3013, we find no error.
The assessment fee is mandatory; the judge has no discretion to
waive it based on the defendant's ability to pay nor does the
Constitution require him to do so. United States v. Nguyen, 916

F.2d 1016, 1020 (5th Cir. 1990); United States v. Rivera-V lez,

839 F.2d 8, (1st Cir. 1988).

-119-

conviction of defendant Ward on Counts 24 and 25 and the judgment

of conviction of defendant Landman on Counts 23 through 26 are

vacated and their cases are remanded for resentencing. The

district court's imposition of costs for supervised release are

vacated for defendants Brandon, Landman, Hagopian, Ward and

Kumalae.

-120-